The CESSNA AIRCRAFT
COMPANY, Plaintiff,

v.

HARTFORD ACCIDENT & INDEMNITY COMPANY, John Does, certain, Unidentified Underwriting Members of Lloyd's of London, Allstate Insurance Company, Successor to Northbrook Insurance Company, Pine Top Insurance Company, Manhattan Fire & Marine Insurance Company, United States Fire Insurance Company, Westport Insurance Corp., f/k/a The Puritan Insurance Company, Old Republic Insurance Company, Twin City Fire Insurance Company and International Insurance Company, Defendants.

No. 93–2425–JWL.

United States District Court,
D. Kansas.

Aug. 9, 1995.

Mary L. Barrier, F. Rebecca Sapp, William E. Hanna, Steven J. Boyd, Morrison & Hecker, Kansas City, MO, for Cessna Aircraft Company.

Joseph R. Colantuono, Polsinelli, White, Vardeman & Shalton, Overland Park, KS, W. Russell Welsh, Robert L. Wehrman, William E. Hans, Polsinelli, White, Vardeman & Shalton, Kansas City, MO, Ignatius John Melito, Robert F. Walsh, Donna M. Rowley, Siff Rosen P.C., New York City, Andrew C. Marquardt, Marquardt & Associates, L.L.C., Fairway, KS, for Hartford Accident and Indemnity Co.

Joe B. Whisler, Cooling & Herbers, P.C., Kansas City, MO, Russell C. Leffel, Shawnee Mission, KS, William D. Ellison, Lord, Bissell & Brook, Chicago, IL, for John Does.

Edward J. Barbosa, Edward L. Smith, Knipmeyer, McCann, Smith, Manz & Gotfredson, Kansas City, MO, Timothy M. Nolan, Robert N. Lane, Gleason, McGuire & Shreffler, Chicago, IL, Mary Fran Farley, Peter Petrou, Cuyler, Burk & Matthews, Parsippany, NJ, for Allstate Insurance Company.

Anthony F. Rupp, Charles J. Hyland, Shughart, Thomson & Kilroy, Overland Park, KS, Joel R. Mosher, Bradley D. Holmstrom, Shughart, Thomson & Kilroy, Kansas City, MO, for Manhattan Fire & Marine Insurance Company and Westport Insurance Corp.

Michael G. Norris, Norris & Keplinger, L.L.C., Overland Park, KS, for United States Fire Insurance Company and International Insurance Co.

W. Russell Welsh, William E. Hans, Polsinelli, White, Vardeman & Shalton, Kansas City, MO, Ignatius John Melito, Robert F. Walsh, Donna M. Rowley, Siff Rosen P.C., New York City, Andrew C. Marquardt, Marquardt & Associates, L.L.C., Fairway, KS, for Old Republic Insurance Co. and Twin City Fire Insurance Co.

Joe B. Whisler, Cooling & Herbers, P.C., Kansas City, MO, William D. Ellison, Lord, Bissell & Brook, Chicago, IL, for Ronald John Smith.

Thomas R. Hill, Hill & Beam–Ward, Overland Park, KS, John M. Lilla, Lindsay K. McFerrin, Jackson, Lilla & McFerrin, P.C., Kansas City, MO, Mark J. Hill, Thaddeus J. Weaver, Donald J. Matthews, Jr., Christie, Pabarue, Mortensen and Young, P.C., Philadelphia, PA, for Commercial Union Insurance Company.

Charles P. Efflandt, Foulston & Siefkin, Wichita, KS, for Foulston & Siefkin Law Firm.

### *MEMORANDUM AND ORDER*

LUNGSTRUM, District Judge.

### I. INTRODUCTION

This is an action for both recovery of damages and a declaratory judgment to determine whether insurance policies issued to the Cessna Aircraft Company (Cessna) by various defendant insurance companies require defendants to indemnify or pay on behalf of Cessna damage and loss resulting from claims made and costs incurred by Cessna due to groundwater contamination originating from the Obee Road Superfund Site, including the former City of Hutchinson municipal landfill (the Obee Road Landfill Subsite), the Fourth and Airport Road Subsite, and Cessna's former Fluid Power Facility in Hutchinson, Kansas (the East Fourth Street or Fluid Power Facility Site). Cessna also seeks a declaration of coverage for future loss, recovery of reasonably certain future losses and recovery of its attorneys' fees in this action.

This matter is currently before the court on the following motions: Cessna's motion for partial summary judgment (Doc. # 471)[1]; the motion of defendant Smith and Companies[2] for partial summary judgment with

1. Cessna also moves for additional time to respond to certain defendants' motions for summary judgment (Doc. # 491). That motion is granted.

2. These defendants are a group of underwriters at Lloyd's, London and other insurance companies that are referred to for purposes of this litigation as "Smith and Companies."

respect to certain insurance contracts (Doc. # 442); the motion of defendants Commercial Union Insurance Company (CU), et al., for summary judgment based on Cessna's breach of contract (Doc. # 445); the motion of the United States Fire Insurance Company (US Fire), et al., for summary judgment on the issue of late notice of claims (Doc. # 448); the motion of defendants Westport Insurance Corp. (Westport), et al., for summary judgment as to Cessna's "estoppel" claim (Doc. # 451); the motion of defendants Hartford Accident and Indemnity Company (Hartford), et al., for summary judgment as to Cessna's claims for coverage with respect to the Fourth and Airport Road Subsite (Doc. # 453); the motion of defendants Westport, et al., for summary judgment based on the pollution exclusion (Doc. # 455); the motion of defendant Hartford for summary judgment based on collateral estoppel (Doc. # 468); the motion of defendants Allstate, et al., to strike paragraph 23 of section 8 of the pretrial order (Doc. # 480); the joint motion of defendants on allocation issues (Doc. # 492); the motion of defendants CU and Old Republic Insurance Company (Old Republic) to strike and for partial joinder (Doc. # 497); and on the motion of defendants International Insurance Company (International), et al., to strike or in the alternative motion pursuant to federal rule of civil procedure 56(f) (Doc. # 504).

For the reasons set forth fully below, Cessna's motion for partial summary judgment (Doc. # 471) is granted in part on the issue of damages and the owned-property exclusion, granted in part and denied in part on the issue of trigger of coverage, granted in part and denied in part on the issue of the meaning of "neither expected nor intended" in the policies and denied as to all other issues. The motion of defendant Smith and Companies for partial summary judgment with respect to certain insurance contracts (Doc. # 442) is denied on the grounds that issues of fact preclude judgment as a matter of law. The motion of defendants CU, et al., for summary judgment based on Cessna's breach of contract (Doc. # 445) is denied. The court finds that Cessna has breached relevant policy provisions, but that issues of fact as to prejudice preclude summary judgment. The motion of US Fire, et al., for summary judgment on the issue of late notice of claims (Doc. # 448) is denied because of the existence of questions of fact. The motion of defendants Westport, et al., for summary judgment as to Cessna's "estoppel" claim (Doc. # 451) is granted. The motion of defendants Hartford, et al., for summary judgment as to Cessna's claims for coverage with respect to the Fourth and Airport Road Subsite (Doc. # 453) is granted on the grounds that Cessna has not met its burden to show a genuine issue of material fact exists. The motion of defendants Westport, et al., for summary judgment based on the pollution exclusion (Doc. # 455) is denied on the grounds that questions of fact preclude judgment as a matter of law. The motion of defendant Hartford for summary judgment based on collateral estoppel (Doc. # 468) is denied as moot. The motion of defendants Allstate, et al., to strike paragraph 23 of section 8 of the pretrial order (Doc. # 480) is denied. The nondispositive joint motion of the defendants on allocation issues (Doc. # 492) is granted. The motion of defendants CU and Old Republic to strike and for partial joinder (Doc. # 497) is granted. And the motion of defendants International, et al., to strike or in the alternative motion pursuant to federal rule of civil procedure 56(f) (Doc. # 504) is granted in part and moot in part.

## II. FACTUAL BACKGROUND

Cessna is a Kansas corporation engaged principally in the manufacture of small aircraft. This action, however, involves Cessna's manufacturing operation at its former Fluid Power Division in Hutchinson, Kansas. At Fluid Power, Cessna manufactured hydraulic components for manufacturers of farm machinery and heavy construction equipment. Cessna originally acquired the Hutchinson property in 1942.

Cessna began the manufacture of hydraulic components in 1952, after the Korean War. It was at this time that it first began to use trichloroethylene (TCE) at the Hutchinson facility. TCE is an organic solvent commonly used by manufacturers to degrease parts. Solvent degreasing is a physical method of removing wax, grease, or dirt from metal, glass and other material surfaces, by contracting the material with the solvent or its vapor.

From the inception of its manufacturing operations at the Fluid Power Facility, Cessna was connected to the City of Hutchinson water system for both industrial process lines and sanitary uses. In the fall of 1983 and 1984, solvent contamination was found in private residential wells tested by the Kansas Department of Health and Environment (KDHE) in Obeeville, a community close to the Obee Road Superfund Site.

On November 18, 1987, the Environmental Protection Agency (EPA) sent Cessna a section 104[3] request for information with respect to Cessna's involvement with the area of the existing municipal airport[4] near Hutchinson, Kansas, and the use of hazardous waste substances by Cessna. The letter indicated that hazardous materials had been improperly disposed of in the general area of the existing airport, that these compounds were originally detected in shallow groundwater near the community of Obeeville and had been found to exist in areas within and near the airport property. Cessna was given fifteen days to supply the requested information.

In response, Cessna indicated, among other things, that it had transported waste materials, including barrelled waste solvent to the municipal landfill located in the area from 1953 through 1968 when the landfill closed.

Cessna sold the Fluid Power plant to Eaton Corporation (Eaton) in July of 1988. After the sale, Eaton performed an environmental audit of the plant which disclosed a plume of contamination, apparently emanating from the plant area. The primary contaminant identified was TCE. Cessna became aware of the audit no later than February of 1989.

On February 16, 1988, Cessna notified Hartford by letter of the discovery of groundwater contamination in the vicinity of the municipal airport, of the EPA's letter for information and future enforcement action and of its belief that clean up efforts would be necessary in the near future. By copy of the same letter, Cessna notified Dulaney, Johnston & Priest Insurance (DJ & P) of the same information. DJ & P subsequently sent a letter to Frank B. Hall & Co. of Pennsylvania referencing the potential hazardous waste cleanup, who in turn sent a report to Lukis Stewart Price Forbes, Ltd., and Stewart Smith East, Inc., as well as a copy of the report to DJ & P in May of 1988.

Stewart Smith subsequently sent a "report of loss" to Northbrook Excess & Surplus Lines Insurance Company on June 10, 1988 which indicated that copies would be sent to Stewart Smith East, Inc., Wheeler Kelly Hagny Insurance Agency (WKH), Frank B. Hall & Co. and DJ & P. The report identified Cessna Aircraft as the assured, the type of loss as environmental and the date of loss as unknown.

In December of 1989, the EPA sent Cessna a Notice of Potential Liability regarding the Obee Road site naming Cessna a potentially responsible party (PRP) under CERCLA and informing it of potential response activities at the site. It indicated that the EPA and KDHE had documented the release or threatened release of hazardous substances at the site and had spent, or were considering spending, public funds on actions to investigate and control the releases.

By letter dated January 5, 1990, Cessna provided Hartford with additional information concerning the EPA and KDHE interest in the municipal landfill area, including the results of the EPA's final report on the Obee Road Superfund Site[5] and the EPA's section

3. Under the provisions of section 104 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. §§ 9601 et seq., as amended by the Superfund Amendments and Reauthorization Act of 1986 (SARA), and pursuant to § 3007 of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6927, the EPA is authorized to require any person to furnish requested information relevant to a particular release of hazardous substances and/or wastes.

4. The municipal airport is north and one mile east of the Cessna facility in Hutchinson. The old municipal landfill (the Obee Road Landfill) is also approximately one mile from the Fluid Power Facility.

5. Plaintiff contends that as the investigation of the groundwater contamination at the Obee Road Site continued, the original site was expanded and then subdivided into three separate "sites" for investigation and remediation: the municipal landfill subsite, the Fourth and Airport Road subsite, and the East Fourth Street Facility site. Defendants refute this characterization of the evidence in some respects. For ease of refer-

107 notice to Cessna that it was a potentially responsible party under CERCLA.

On March 21, 1990, Cessna and the KDHE signed the Obee Road PRP Participation and Organization Agreement. On January 17, 1991, Cessna and the KDHE executed a Consent Agreement and Consent Order in the matter of the East Fourth Street Facility.

In May of 1994, the KDHE wrote Cessna informing it that a "Phase V RI" was required to be performed to complete the remedial investigation on the East Fourth Street Facility Site to further delineate the extent of contamination of a reported secondary plume north of the plume specifically associated with the Hutchinson plant facility.

As of July 1, 1994, Cessna had paid approximately $1.7 million to investigate and remediate the groundwater contamination at the East Fourth Street Facility Subsite, and $150,500 to respond to the EPA's claims in connection with the former municipal landfill subsite. Cessna alleges that it will be responsible for additional remediation costs in connection with the contamination from the East Fourth Street Facility in the amount of $11.5 million. Also as of July 1, 1994, Cessna had paid $38,082.05 in attorneys' fees associated with the actions of the EPA and KDHE.

Hartford issued various primary and umbrella liability insurance policies to Cessna from 1970 to 1985. Cessna contends that Hartford also issued primary insurance policies to Cessna between 1952 and 1964, which policies are "missing."[6] In addition, the following insurance policies were issued to Cessna: Twin City Fire Insurance Company (Twin City Fire) issued various liability insurance policies to Cessna from 1981 to 1985; Old Republic issued an umbrella liability insurance policy to Cessna effective from October 1, 1981 to October 1, 1982; CU issued a comprehensive general liability insurance policy to Cessna which remained effective from October 1, 1980 to April 24, 1981; Smith and Companies issued various liability insurance policies to Cessna effective at vari-

ous times beginning in 1959 and ending no later than 1972;[7] Allstate as successor-in-interest to Northbrook Insurance Company (Northbrook) issued three liability insurance policies to Cessna effective from October 1, 1975 to October 1, 1978; Westport, successor in interest to Manhattan Fire and Marine Insurance Co. (Manhattan Fire), issued one liability insurance policy to Cessna effective from October 1, 1978 to October 1, 1979; Westport also issued an excess liability policy allegedly effective from October 1, 1980 to October 1, 1981; and International issued an excess insurance policy which remained effective from October 1, 1984 to May 6, 1985.

### III. LEGAL STANDARDS

#### A. Summary Judgment Standard

When considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the nonmoving party. *Jones v. Unisys Corp.*, 54 F.3d 624, 628 (10th Cir.1995). A moving party who bears the burden of proof at trial is entitled to summary judgment only when the evidence indicates that no genuine issue of material fact exists. Fed.R.Civ.P. 56(c); *Anglemyer v. Hamilton County Hosp.*, 58 F.3d 533 (10th Cir.1995). If the moving party does not bear the burden of proof at trial, it must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

Once the movant meets these requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). The nonmovant may not merely rest on the pleadings to meet this burden. *Id.* Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be re-

---

ence only, the court will refer to the three areas, the landfill, the fluid power facility area and the airport road area, as three different subsites.

**6.** Neither Cessna nor Hartford have been able to locate these alleged policies.

**7.** Smith & Companies disputes the existence of certain policies that plaintiff alleges were in force at various times throughout this period, but concedes the existence of others. The court will not here delineate all of defendant's objections but will address them as necessary throughout this order.

solved in favor of either party." *Id.* at 250, 106 S.Ct. at 2511; *Tersiner v. Union Pacific R. Co.,* 740 F.Supp. 1519, 1522–23 (D.Kan. 1990). More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555.

### B. Interpretation of Insurance Contracts

 Because resolution of certain issues raised by the pending motions involves questions of interpretation of insurance policy provisions, the court also reviews at the outset the legal standard to be applied in doing so. An insurance policy is a contract, so its language, like that of any other contract must, if possible, be construed in a manner so as to effect the parties' intent. *Chance v. Farm Bureau Mut. Ins. Co.,* 756 F.Supp. 1440, 1442 (D.Kan.1991); *Catholic Diocese of Dodge City v. Raymer,* 251 Kan. 689, 693, 840 P.2d 456 (1992).[8] In determining that intent, the court is not bound by the insurer's subjective or undisclosed intent, but rather considers the contract as a whole, and reads the terms of the policy as a reasonable person in the insured's position would have understood them. *Lapeka, Inc. v. Security Nat'l Ins. Co.,* 814 F.Supp. 1540, 1544 (D.Kan.1993).

 Where an insurance contract is unambiguous, the court must enforce it as made, and must enforce the unambiguous language according to its plain, ordinary and popular sense. *City of Salina, Kan. v. Maryland Cas. Co.,* 856 F.Supp. 1467, 1475 (D.Kan. 1994). "Where there is no ambiguity, there is no need for either judicial interpretation or the application of liberal rules of construction" in favor of the insured. *Id.* If, however, a provision is ambiguous, and is susceptible of more than one reasonable interpretation, the interpretation more favorable to the insured must prevail, for it is the duty of the insurer to make its meaning clear. *Id.* at 1475–76.

**8.** As this is a diversity action, the court must ascertain and apply Kansas law and attempt to reach the same result a Kansas court would reach. *Lutz Farms v. Asgrow Seed Co.,* 948 F.2d 638, 641 (10th Cir.1991).

### IV. DISCUSSION

#### A. Cessna's Motion for Partial Summary Judgment

Cessna has moved for partial summary judgment on a variety of issues. The court addresses each one in turn.

##### 1. Damages

 Plaintiff seeks partial summary judgment determining that the term "damages" as used in the policies includes money paid in response to demands of third parties to remediate groundwater contamination. Defendants contend that response costs are purely "equitable relief" and as such are not "damages" under the policies. Courts are split on whether response costs are damages. After careful consideration of the arguments of all parties and extensive authority on the subject, the court finds that the term "damages" includes both legal and equitable relief and covers costs in response to the KDHE's and EPA's claims here. Giving the language of the policy, the term "damages," its plain and ordinary meaning, as the court must under Kansas law, the court finds it to include both types of relief.

Courts finding that the term "damages" does not cover response costs, or costs of clean-up or remediation, have done so by reasoning that the term "damages" has been generally understood in the insurance industry to refer to legal damages. They have reasoned that because CERCLA distinguishes between clean-up costs and compensation for injury to property, construing the term "damages" to apply only to traditional legal damages is consistent with the statutory scheme. The most recent case law, however, indicates that the majority of courts have abandoned this technical legal/equitable distinction and have found that "damages" may include response costs and costs of remediation. *Morton Intern., Inc. v. General Acc. Ins. Co. of America,* 134 N.J. 1, 29, 629 A.2d 831, 845 (1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2764, 129 L.Ed.2d 878 (1994).[9] At least two courts in this jurisdic-

**9.** "The clear weight of authority, however, among both federal and state courts adopts the view that the undefined term 'damages' in CGL policies should be accorded its plain, non-technical meaning, thereby encompassing response costs imposed to remediate environmental dam-

tion have found damages to include costs of remediation while one earlier case held to the contrary. *See Glickman, Inc. v. Home Insurance Co.,* No. 93–1421–PFK, 1994 WL 324554 (D.Kan. June 29, 1994); *Cessna Aircraft Co. v. Hartford Accident & Indemnity Co.,* 91–2346–KHV, 1993 WL 65687 (D.Kan. Feb. 17, 1993); *cf. United States Fidelity & Guar. Co. v. Morrison Grain Co.,* 734 F.Supp. 437, 450 (D.Kan.1990), *aff'd on other grounds,* 999 F.2d 489 (10th Cir.1993).

The court finds the reasoning of the apparent majority of courts that hold "damages" includes both legal and equitable relief persuasive and consistent with the application of Kansas law. An ordinary person would not consider damages as those solely in the nature of legal and not equitable relief. A reasonable insured examining the policy would understand the term to refer to both types of damages. *See Farm Bureau Mut. Ins. Co. v. Laudick,* 18 Kan.App.2d 782, 784, 859 P.2d 410, 412 (1993) ("A contract of insurance should not be construed through the magnifying eye of the technical lawyer but rather from the standpoint of what an ordinary man would believe it to mean."). If an insurer intended to afford coverage only for legal, as opposed to equitable, damages, it certainly could have defined the term in the policies. Cessna's motion for partial summary judgment on this issue is granted.

### 2. Owned–Property Exclusion

■ Cessna has also moved for summary judgment with respect to defendants' claim that there is no coverage for the underlying pollution matters in whole or in part because the alleged property damage constitutes damage to property owned, occupied or used by, or in the care, custody or control of Cessna. Cessna contends that the groundwater underlying the Obee Road Superfund Site and all alleged subsites including the former Fluid Power Facility is the property of the state and people of Kansas and that the various "owned-property exclusions" do not apply as a matter of law. The court agrees with plaintiff's position and finds partial summary judgment appropriate.

It appears a majority of courts have rejected insurers' attempts to preclude coverage for contamination of groundwater based on application of "owned property" exclusions similar to those found in the policies at issue here. *See, e.g., Anderson Dev. Co. v. Travelers Indem. Co.,* 49 F.3d 1128 (6th Cir.1995); *Intel Corp. v. Hartford Accident & Indem. Co.,* 952 F.2d 1551 (9th Cir.1991); *Gerrish Corp. v. Universal Underwriters Ins. Co.,* 947 F.2d 1023 (2d Cir.1991), *cert. denied,* 504 U.S. 973, 112 S.Ct. 2939, 119 L.Ed.2d 564 (1992); *Patz v. St. Paul Fire and Marine Ins. Co.,* 15 F.3d 699 (7th Cir.1994); *MAPCO Alaska Petroleum, Inc. v. Central Nat'l Ins. Co. of Omaha,* 795 F.Supp. 941, 949 (D.Alaska 1991); *Northern States Power Co. v. Fi-*

age." *Morton Intern.,* 134 N.J. at 29, 629 A.2d at 845 (citing *Aetna Casualty & Sur. Co. v. Pintlar Corp.,* 948 F.2d 1507, 1513 (9th Cir.1991) (applying Idaho law); *Gerrish Corp. v. Universal Underwriters Ins. Co.,* 947 F.2d 1023, 1030 (2d Cir. 1991) (applying Vermont law), *cert. denied,* 504 U.S. 973, 112 S.Ct. 2939, 119 L.Ed.2d 564 (1992); *Independent Petrochemical Corp. v. Aetna Casualty & Sur. Co.,* 944 F.2d 940, 947 (D.C.Cir. 1991) (applying Missouri law), *cert. denied sub nom. Certain Underwriters at Lloyd's, London v. Independent Petrochemical Corp.,* 503 U.S. 1011, 112 S.Ct. 1777, 118 L.Ed.2d 435 (1992); *New Castle County v. Hartford Accident & Indem. Co.,* 933 F.2d 1162, 1184–91 (3d Cir.1991) (applying Delaware law), on remand, 778 F.Supp. 812 (D.Del.1991), *rev'd on other grounds,* 970 F.2d 1267 (3d Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 1846, 123 L.Ed.2d 470 (1993); *Avondale Indus., Inc. v. Travelers Indem. Co.,* 887 F.2d 1200, 1207 (2d Cir.1989) (applying New York law), *cert. denied,* 496 U.S. 906, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990); *Township of Gloucester*

*v. Maryland Casualty Co.,* 668 F.Supp. 394, 400 (D.N.J.1987) (applying New Jersey law); *AIU Ins. Co. v. Superior Court,* 51 Cal.3d 807, 274 Cal.Rptr. 820, 834–45, 799 P.2d 1253, 1267–78 (1990); *Aerojet–General Corp. v. Superior Court,* 211 Cal.App.3d 216, 257 Cal.Rptr. 621, 628 (1989); *A.Y. McDonald Indus. v. Insurance Co. of North America,* 475 N.W.2d 607, 615–22 (Iowa 1991); *Hazen Paper Co. v. United States Fidelity & Guar. Co.,* 407 Mass. 689, 555 N.E.2d 576, 582–84 (1990); *United States Aviex Co. v. Travelers Ins. Co.,* 125 Mich.App. 579, 336 N.W.2d 838, 842–43 (1983); *Minnesota Mining & Mfg. Co. v. Travelers Indem. Co.,* 457 N.W.2d 175, 179–84 (Minn.1990); *C.D. Spangler Constr. Co. v. Industrial Crankshaft & Eng'g Co.,* 326 N.C. 133, 388 S.E.2d 557, 565–69 (1990); *Boeing Co. v. Aetna Casualty & Sur. Co.,* 113 Wash.2d 869, 784 P.2d 507, 510–15 (1990); *Compass Ins. Co. v. Cravens, Dargan & Co.,* 748 P.2d 724, 729–30 (Wyo. 1988)); *see also Chesapeake Utilities Corp. v. American Home Assur. Co.,* 704 F.Supp. 551, 559 (D.Del.1989).

*delity and Casualty Co. of New York,* 504 N.W.2d 240, 246 (Minn.App.1993), *aff'd,* 523 N.W.2d 657 (Minn.1994); *LaSalle Nat'l Trust N.A. v. Schaffner,* 818 F.Supp. 1161 (N.D.Ill.1993); *Maryland Casualty Co. v. Wausau Chemical Corp.,* 809 F.Supp. 680, 693 (W.D.Wis.1992); *Claussen v. Aetna Casualty & Sur. Co.,* 754 F.Supp. 1576, 1579 (S.D.Ga.1990); *cf. UMC Stamford, Inc. v. Allianz Underwriters Ins. Co.,* 276 N.J.Super. 52, 647 A.2d 182 (1994). *Contra Shell Oil Co. v. Winterthur Swiss Ins. Co.,* 12 Cal.App.4th 715, 759, 15 Cal.Rptr.2d 815, 844 (1993). The court is of the opinion that, if faced with the issue, the Kansas Supreme Court would follow generally this line of cases and reject defendants' attempts here to exclude coverage based on the "owned-property exclusions."

Under Kansas law, the right of a person to groundwater underlying his or her land is to the usufruct of the water and not to the water itself. *Williams v. City of Wichita,* 190 Kan. 317, 334, 374 P.2d 578, 594–95 (1962). "The ownership of land does not carry with it any ownership of vested rights to underlying groundwater not actually diverted and applied to beneficial use." *Id.* All water within the state of Kansas is dedicated to the use of the people of the state and subject to the control and regulation of the state. K.S.A. 65–161(a) ("waters of the state" defined as all streams and springs, and all bodies of surface and subsurface waters within the boundaries of the state); K.S.A. 82a–702 (water within state of Kansas dedicated to the use of the people of the state and subject to control and regulation of the state); *see also F. Arthur Stone & Sons v. Gibson,* 230 Kan. 224, 231, 630 P.2d 1164, 1170 (1981). Thus, under Kansas law, groundwater cannot be owned, nor is it controlled, by Cessna within the meaning of the various owned-property exclusions. *See United States Aviex Co. v. Travelers Ins.*

*Co.,* 125 Mich.App. 579, 336 N.W.2d 838, 843–44 (1983).

■ Nor does the court believe a genuine fact question exists with respect to those policies which more broadly exclude coverage for property "used," "in the care, custody or control" of the insured, or as to property to which "the insured is for any purpose exercising physical control." Defendants point to evidence that a well at the Fluid Power Facility was occasionally used to fill up the fire water reservoir at the plant or was occasionally pumped "to wash the ice off the paint line" as evidence that Cessna used, or had in its care custody or control the groundwater beneath the Fluid Power Facility.[10] While this is evidence that Cessna used or controlled *some* groundwater, it is not evidence that Cessna used or controlled the groundwater that is allegedly contaminated and gives rise to plaintiff's losses. *See North Pac. Ins. Co. v. United Chrome Prods., Inc.,* 122 Or.App. 77, 83, 857 P.2d 158, 161 (1993). The use of the well on apparently rare occasions does not establish use or control of the groundwater migrating underneath and past the Fluid Power Facility in the soil's subsurface, the groundwater at issue. Pursuant to Kansas law, this groundwater is controlled by the State of Kansas.[11] For these reasons, plaintiff's motion for partial summary judgment is granted and the court finds the owned-property exclusions inapplicable as a matter of law.

### 3. Trigger of Coverage

Plaintiff seeks a ruling that "coverage for environmental damage to groundwater is triggered both by actual injury to property and/or by exposure to contaminants during the policy period" under all of the comprehensive general liability, umbrella and excess policies issued by the various defendants. It contends that, while questions whether prop-

**10.** Defendants do not point to any evidence to indicate that groundwater beneath the landfill area or the Fourth and Airport Road subsite was in any way owned, controlled or used by Cessna. The court grants plaintiff's motion with respect to these sites on this additional ground.

**11.** Nor does the fact that the plant well has been used since 1993 as a recovery well to treat the

contamination establish a genuine issue of fact for trial. Cessna had no ownership interest in this well or the plant property in 1993, but had already sold the property to Eaton. The court simply does not find that Cessna "used" or "controlled" the groundwater allegedly damaged within the meaning of the policy exclusions.

erty damage was caused by accident and whether property damage occurred within each policy period are questions of fact for the jury, the question of what must happen within the policy period to trigger coverage under the policies is one of law for the court. Defendants respond that the issue of what triggers coverage under the policies is a mixed question of law and fact, a ruling upon which should await trial. They ask that the court reject plaintiff's attempts to "separate the trigger issue from the essential facts to be determined by the jury and convert it into a dry legal issue."

While it is not precisely clear the full scope of the ruling plaintiff seeks by its motion, the court does believe that the trigger issue should be dealt with to some extent at this time. The issue is complicated by the potential applicability of a number of policies with varying language regarding accidents, occurrences or events triggering coverage. The court attempts here to deal with purely legal issues with respect to trigger of coverage under the various policies in an effort to narrow and clarify the pertinent factual issues to be presented and determined at trial. In doing so, the court will also respond to the specific concerns and questions raised by the separate filings of Hartford, Twin City Fire, Westport, Allstate, CU and Smith and Companies.

*a. Hartford and Twin City Fire Policies*

The primary policies issued to Cessna from 1970 to 1985 contained the following provision:

> ... the company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage ... to which this insurance applies, caused by an occurrence....

The umbrella policies (issued between 1970 to 1975) provide that Hartford would:

> indemnify the insured for any sums which the insured shall become legally obligated to pay as damages and expenses, all as hereinafter defined as included within the term ultimate net loss, by reason of liability (a) imposed upon the insured by law ... because of (ii) property damage caused by ... an occurrence which takes place dur-

ing the policy period anywhere in the world.

All Hartford policies obligate Hartford to pay on behalf of Cessna all sums for bodily injury and property damage caused by an occurrence. Occurrence is defined in the primary policy effective October 1, 1971 to October 1, 1974 as follows:

> "Occurrence" means an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured;

Property damage is defined in this primary policy as follows:

> "Property damage" means injury to or destruction of tangible property;

An occurrence is defined in the primary policies beginning October 1, 1974 as follows:

> "Occurrence" means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured;

Property damage is defined in the primary policies beginning October 1, 1974 as:

> (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

The umbrella policies for the period 1971 to 1972 and 1972 to 1975 define an occurrence and property damage as:

> An accident which takes place during the policy period or that portion within the policy period of a continuous or repeated exposure to conditions, which causes personal injury, property damage or advertising liability neither expected nor intended by the insured.
>
> "Property Damage" means injury to or destruction of tangible property, other than property owned by a named insured, and all loss resulting therefrom.

The relevant provisions of the Twin City insurance contracts are substantially the

same or similar to those of Hartford with respect to such terms as "occurrence" and "property damage." For the policy issued between 1984 and 1985, Twin City agreed "to pay on behalf of the insured ultimate net loss ... because of property damage ... caused by an occurrence." For the policy in effect between 1981 and 1982, Twin City agreed to "indemnify the insured for ultimate net loss in excess of the underlying insurance."

The Hartford and Twin City Fire policies unambiguously state that they will provide coverage for sums which the insured becomes obligated to pay as damages because of property damage or injury to property caused by an occurrence or accident. Property damage clearly must occur during the policy period. This principle is set forth directly in the definition of occurrence in the policies for the period 1971 to 1974. For the policies beginning October 1, 1974 and thereafter, it is set forth by reading the definition of occurrence and property damage together. By definition, property damage is damage to tangible property which happens during the policy period. Contamination to groundwater, if proved, would constitute damage to tangible property. If such contamination occurred during the term of a Hartford or Twin City Fire policy, coverage would be

"triggered" in that the policy would respond, provided all other terms and conditions of the policy were met and coverage was not otherwise excluded.

To the extent this analysis is consistent with the relief sought in plaintiff's motion, that motion is granted in part. However, the court will not rule at this time whether any "exposure" of groundwater to contaminants during the policy period is covered. If "exposure" to contaminants and groundwater contamination, according to plaintiff's theory, occurred virtually simultaneously, then it would seem that there is no practical difference between "exposure" and actual injury in this context. *Cf. Quaker State Minit–Lube, Inc. v. Fireman's Fund Ins. Co.*, 868 F.Supp. 1278, 1304 (D.Utah 1994), *aff'd*, 52 F.3d 1522 (10th Cir.1995). However, because plaintiff has not set forth proposed uncontroverted facts indicating that "exposure" of the groundwater to contaminants caused property damage, the court defers any ruling on whether "exposure" would constitute property damage under these policies until a full factual record has been developed at trial.

*b. Old Republic, Manhattan Fire, US Fire, Westport and International Policies*

The previous analysis is also applicable to the policies issued by Old Republic,[12] CU,[13]

12. The Old Republic umbrella liability insurance policy issued to Cessna and effective from October 1, 1981 to October 1, 1982 stated that Old Republic would:
indemnify the Assured for all sums which the Assured shall be obligated to pay be reason of the liability (a) imposed upon the Assured by law, or (b) assumed under contract or agreement by the Named Assured ... for damages on account of ... (ii) property damage ... caused by or arising out of each occurrence happening anywhere in the world.
The policy applies to "property damage" caused by an "occurrence" which is defined as:
The term "occurrence" wherever used herein shall mean an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage or advertising liability during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed an occurrence.
Property damage is defined as:
The term "Property Damage" wherever used shall mean (1) physical injury to or destruction of tangible property which occurs during the

policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

13. CU issued a comprehensive general liability insurance policy to Cessna which remained effective from October 1, 1980 to April 24, 1981 in which CU agreed to pay on behalf of the insured:
all sums which the insured shall become legally obligated to pay as damages because of ... property damage to which this insurance applies, caused by an occurrence.
The policy provides coverage for property damage caused by an occurrence, which is defined as:
accident including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected or intended from the standpoint of the insured;
"Property damage" is defined as:
(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically

Manhattan Fire,[14] US Fire,[15] Westport,[16] Northbrook [17] and International.[18] Thus,

injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

14. Defendant Westport, successor in interest to Manhattan Fire and Marine Insurance Co., issued one liability insurance policy to Cessna effective from October 1, 1978 to October 1, 1979. Manhattan agreed in the policy to:

indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability (a) imposed upon the Assured by law, or (b) assumed under contract or agreement by the Named Assured ... for damages on account of: ... (ii) Property Damage ... caused by or arising out of each occurrence happening anywhere in the world.

The policy provided coverage for property damage caused by an occurrence and further that:

The term "Occurrence" wherever used herein shall mean an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage or advertising liability during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence.

The term "Property Damage" wherever used herein shall mean (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

15. Defendant United States Fire issued an excess liability insurance policy to Cessna effective from October 1, 1979 to October 1, 1980. It provided that United States Fire would:

indemnify the Insured against ultimate net loss in excess of and arising out of the hazards covered and as defined and in excess of the underlying insurance as shown [in the policy]....

The relevant provisions of the insurance contract are substantially the same or similar to those of Hartford regarding such terms as the exclusion for damage for property owned by the insured.

16. Westport agreed:

to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability (a) imposed upon the Assured by law, or (b) assumed under contract or agreement by the Named Assured ... for damages on account of: ... (ii) Property Damage ... caused by or arising out of each occurrence happening anywhere in the world.

Occurrence and property damage are defined as follows:

The term "Occurrence" wherever used herein shall mean an accident or a happening or

event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage or advertising liability during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence.

The term "Property Damage" wherever used herein shall mean (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom....

17. Northbrook issued three liability insurance policies to Cessna effective from October 1, 1975 to October 1, 1978, pursuant to which Northbrook agreed, subject to certain limitations, terms and conditions, to:

indemnify the Insured for all sums which the Insured shall be obligated to pay by reason of the liability (a) imposed upon the insured by law, or (b) assumed under contract or agreement by the Named Insured ... for damages on account of: ... (ii) Property Damage ... caused by or arising out of each occurrence happening anywhere in the world.

Property damage and occurrence are defined in policy 63–001–190 as follows:

"Occurrence" shall mean an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally result in personal injury, property damage or advertising liability during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence.

The phrase "Property Damage" shall mean loss of or direct damage to or destruction of tangible property (other than property owned by the Named Insured).

The terms are defined in policy 63–002–298 and 63–003–698 as follows:

"Occurrence" means an accident, event or happening including continuous or repeated exposure to conditions which results, during the policy period, in Personal Injury, Property Damage or Advertising Liability neither expected nor intended from the standpoint of the Insured ... All such Personal Injury, Property Damage or Advertising Injury caused by one event or by continuous or repeated exposure to substantially the same conditions shall be deemed to result from one Occurrence.

"Property damage" shall mean loss of or direct damage to or destruction of tangible property (other than property owned by any Insured) and which results in an Occurrence during the policy period.

18. International admits that the relevant provisions of its policies are substantially the same or similar to those of Hartford and Twin City Fire.

coverage under these policies is "triggered" by a showing that property damage occurred during the policy period. Consistent with plaintiff's theory of the case, coverage is triggered when there has been a sufficient showing of contamination of groundwater during the policy period. If, as plaintiff alleges, contamination to groundwater occurred during the terms of many policies and new injuries in fact developed, then multiple policies would be triggered. Again, the court reserves ruling on whether groundwater "exposure" to contamination triggers these policy provisions under the specific facts of this case.

### c. CU and Westport

CU has responded separately to plaintiff's motion, arguing that property damage does not take place under its policy until that damage is discovered or becomes manifest. Because environmental property damage was not discovered until several years after CU's contract was cancelled by Cessna, CU contends that its policy does not provide coverage for Cessna's claims. Westport joins in the response to the extent CU argues for a "manifestation theory" as to the trigger of coverage under the policies. The court's analysis as previously set forth on this issue is consistent with those cases requiring that there be actual injury to property damage in order to trigger coverage under similar liability policies. The court rejects application of a manifestation theory under the circumstances of this case as inconsistent with the clear terms of these policies and Kansas law.

In *Quaker State Minit–Lube, Inc. v. Fireman's Fund Insurance Co.*, 868 F.Supp. 1278 (D.Utah 1994), *aff'd*, 52 F.3d 1522 (10th Cir. 1995), Judge Jenkins summarized the various tests formulated around the country for determining when, in the context of claims for indemnification for costs of environmental clean-up, an "occurrence" has taken place or coverage is triggered within the meaning of a liability insurance policy. He ultimately rejected, among other theories, the manifestation theory, and instead concluded that Utah courts would, under the facts presented, adopt the "injury-in-fact" or "actual-injury"

trigger. *Id.* at 1302–04. The court concluded that, using an actual injury trigger, an occurrence took place each time "property damage" was inflicted and that, where alleged contamination and property damage are continuing, "injuries-in-fact" triggering coverage are also continuing. *Id.* at 1304.

Following the reasoning of Judge Jenkins, the court finds that application of the "injury-in-fact" trigger is more consistent with the language of the CU and Westport policies, especially where, as here, the contamination is alleged to have occurred in particular policy periods and to have continued through many policy periods. The court rejects CU's contention that an economic impact analysis is consistent with the provisions of its policy, that it offers a functional solution or serves the practical interests of the parties or the courts under the circumstances here. The court also rejects CU's contention that the Kansas case, *Scott v. Keever*, 212 Kan. 719, 512 P.2d 346 (1973), supports adoption of the manifestation theory. On the contrary, the court finds *Scott* consistent with an actual-injury approach.

In *Scott*, the Kansas Supreme Court construed language of a comprehensive general liability policy defining an occurrence as an "unexpected event or happening or a continuous or repeated exposure to conditions which results during the policy period in bodily injury, sickness or disease...." 212 Kan. at 723, 512 P.2d 346. The court stated that the "net effect" of such a provision unambiguously "is that if an injury or disease occurs within the policy period and subsequent thereto death occurs or bodily injury or sickness continues any insured is afforded protection against liability for damages resulting therefrom." *Id.* at 724, 512 P.2d 346. The court indicated that the relevant event may be continuous in nature and that protection would be afforded for injury during the policy period. *Id.* When read and understood in its entirety, the opinion is consistent with an actual-injury approach to coverage issues and with the conclusion that the Kansas Supreme Court would reject the manifestation theory under the circumstances of this case.

CU also asks the court to treat its response motion as a cross-motion for partial summary judgment on the issues addressed therein. Because the court rejects application of the manifestation theory to the facts of this case, CU's and Westport's motions are denied. In addition, the court also denies CU's motion with respect to the issue of the effect of Cessna's cancellation of the CU policy. The court believes this issue best suited for consideration in conjunction with other allocation issues in the case, if and when such issues eventually require decision. As is more fully explained below, the court defers its ruling on issues of allocation until the facts of this case are more fully developed, and, thus, believes it appropriate also to defer ruling with respect to the maximum coverage afforded by the CU policy.

### d. Smith and Companies' Policies

■ The language of the Smith and Companies policies at issue varies somewhat from that of the other insurance policies. The policies allegedly provide that:

Underwriters hereby agree, subject to the limitations, terms and conditions hereinafter mentioned, to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability imposed upon the Assured by law, or in respect of operations by or on behalf of the Named Assured, assumed by the Assured under contract or agreement, for damages, direct or consequential, and expenses, all as more fully defined by the term "ultimate net loss", on account of ... property damage, caused by or arising out of each occurrence happening during the policy period anywhere in the world.

"Occurrence" and "property damage" are defined as follows:

The term "Occurrence", wherever used herein, shall mean one happening or series of happenings, arising out of or due to one event taking place during the term of this policy.

The term "property damage", wherever used herein, shall include, but not by way of limitation, damage to or destruction or loss of property, excluding however, dam-

age to property owned by the Named Assured.

From this language, the court concludes that the policies unambiguously require an *occurrence,* as opposed to property damage, *during the policy period. Babcock & Wilcox Co. v. Arkwright–Boston Manuf. Mut. Ins. Co.,* 53 F.3d 762, 766 (6th Cir.1995) (event must occur during the policy term); *Pacific Resources, Inc. v. Oswego Shipping Corp.,* No. 79–1606, 1984 WL 928, at *4 (S.D.N.Y. Sept. 26, 1984).

"Occurrence" is broadly defined in these policies as a "happening or series of happenings," that "arises out of" or is "due to" an "event" taking place during the term of the policy. Plaintiff's theory, as expressed in its reply papers on this issue, is that exposure of groundwater to contamination is an "event" within the occurrence definition of the policy.

The court finds that plaintiff's theory, if proved, could trigger coverage under the policies. Exposure of groundwater to contaminants which occurs during the policy period could constitute an event within the meaning of the policy language. *See Babcock & Wilcox Co.,* 53 F.3d at 768 (worker's exposure to asbestos is an "event" within meaning of policy language); *Pittsburgh Corning Corp. v. Travelers Indemnity Co.,* No. 84–3985, 1988 WL 5302, at *2 (E.D.Pa. January 21, 1988) (same). If that event is shown to give rise to property damage, it appears that the general coverage provision of the policies would be triggered.

To the extent plaintiff sought relief consistent with this analysis of the trigger issue as to the Smith and Companies' policies, it is granted. Any further refinement of this issue will take place at trial in a fuller factual context and, thus, other additional relief sought by plaintiff is denied.

### 4. Expected and Intended

■ Plaintiff has moved the court to declare, as a matter of law, that under the terms of all policies and pursuant to the law of Kansas, property damage is neither expected nor intended "unless the insured has actual knowledge that damage will result from its actions." To the extent that Cessna

is seeking a ruling from this court recognizing that, under Kansas law, the term "neither expected nor intended from the standpoint of the insured" is construed to provide coverage for an unintended injury resulting from an intentional act, Cessna's motion is granted. This is clearly the law of Kansas. To the extent it seeks any further relief, the motion is denied.

Under Kansas law, "provisions of a liability insurance policy which include liability for an accident which results in bodily injury or property damage 'neither expected nor intended from the standpoint of the insured' is construed to provide coverage for an unintended injury resulting from an intentional act." *Spruill Motors, Inc. v. Universal Underwriters Ins. Co.*, 212 Kan. 681, Syl. ¶ 5, 512 P.2d 403 (1973); *see also Lapeka, Inc. v. Security Nat'l Ins. Co.*, 814 F.Supp. 1540, 1547 (D.Kan.1993); *Security State Bank of Kansas City v. Aetna Casualty and Sur. Co.*, 825 F.Supp. 944, 948 (D.Kan.1993) (strict reading of policy language would tend to suggest that an occurrence must be "accidental" and produce an outcome neither expected nor intended from the standpoint of the insured, but Kansas Supreme Court has interpreted clause to provide coverage for an unintended result even if act which produced the result was intentional); *United States Fidelity & Guar. Co. v. Morrison Grain Co.*, 734 F.Supp. 437 (D.Kan.1990) (discussing *Spruill* and subsequent Kansas case law).[19] Thus, a finding that Cessna acted intentionally will not preclude coverage where the resulting injury was unintended. However, also in connection with such policy language Kansas has approved and adopted "a natural and probable consequences test." *Harris v.*

*Richards*, 254 Kan. 549, 553–55, 867 P.2d 325, 328 (1994) (citing *Rankin v. Farmers Elevator Mut. Ins. Co.*, 393 F.2d 718 (10th Cir. 1968); *Spivey v. Safeco Ins. Co.*, 254 Kan. 237, 865 P.2d 182 (1993); *Bell v. Tilton*, 234 Kan. 461, 674 P.2d 468 (1983); *Spruill Motors*, 212 Kan. 681, 512 P.2d 403; *Casualty Reciprocal Exchange v. Thomas*, 7 Kan. App.2d 718, 647 P.2d 1361, *rev. denied*, 231 Kan. 799 (1983)). "The insured's intent to injure can be inferred when the resulting injury is a natural and probable consequence of the insured's act." *Id.* at 552, 867 P.2d at 327–28 (1994). The trier of fact is free to accept or reject the inference and can consider the inference along with other evidence in the case. *Casualty Reciprocal Exchange*, 7 Kan.App.2d at 721, 647 P.2d at 1364. It remains a fact question whether any of Cessna's intentional acts resulted in unintended injury within the meaning of applicable policies as construed pursuant to Kansas law.[20]

### 5. Notice

◼ Plaintiff has also moved for partial summary judgment on the issue of notice, seeking a ruling from this court that, as a matter of law, the insurance agents and brokers through whom Cessna's policies were issued acted as agents and on behalf of the insurers in receiving notice of Cessna's claims. Plaintiff contends that, pursuant to K.S.A. 40–3710,[21] when Cessna provided notice of its claim or loss to certain Kansas agents or brokers, namely WKH, DJ & P and Frank B. Hall, notice was by operation of law deemed to have been provided to the insurers. It argues that the uncontroverted facts of this case establish that Cessna provided requisite notice to DJ & P and WKH and that, pursuant to the Kansas statute,

---

**19.** Cessna's motion seeks a ruling with regard to *all* policies, but its motion only addresses the meaning of the phrase "neither expected nor intended from the standpoint of the insured." There are some policies that contain similar, but not identical language. The court's ruling pertains only to those policies which actually contain this phrase.

**20.** The case law thus far cited and discussed should provide sufficient guidance to the parties for trial purposes with respect to this issue. Any further refinement may take place at trial with specific reference to the facts and the evidence.

**21.** K.S.A. 40–3710 provides, in pertinent part:

> Any insurer which delivers in this state to any insurance broker a contract of insurance pursuant to the application or request of such broker acting for an insured other than such broker shall be deemed to have authorized such broker to act on its behalf in receiving the premium, effectuating policy coverage and receiving notification of claims. Any broker who is also a licensed agent for the company whose policy is negotiated shall be deemed to be acting as an agent for the company.

either DJ & P and/or WKH may be deemed to have acted on behalf of CU, Westport, International, US Fire and Old Republic in receiving this notice. Defendants CU, Westport, International, US Fire, Old Republic and Smith and Companies[22] (hereinafter referred to in this part as "moving insurers") refute plaintiff's contention and, in addition, have moved to strike that part of the pretrial order which sets forth plaintiff's theory of constructive notice.[23] For the reasons set forth below, plaintiff's motion for partial summary judgment on this issue is denied and the motions to strike are granted.

The court finds that this theory should appropriately be struck from the pretrial order. Despite defendants' diligent attempts to inquire, plaintiff did not inform the moving defendants until the pretrial order was entered, after the close of discovery, that it intended to allege that entities other than the insurers themselves were proper parties for receiving plaintiff's notice of claim. It was not until plaintiff's motion for partial summary judgment that the grounds for this theory were ever communicated to defendants. Nothing during discovery in the case could have reasonably informed the moving defendants that Cessna relied on notice to WKH or DJ & P as notice to the moving defendants. Plaintiff's theory is based on a Kansas statute, yet there has been no showing made why Cessna could not have recognized the applicability of the statute early on and given the defendants an opportunity to conduct discovery on this issue. It is apparent to the court from the amended complaint, Mr. Wakefield's deposition and from plaintiff's interrogatory answers, that plaintiff's original theory or theories did not rely on the Kansas statute, but that the statutory theory was developed just before or just after the close of discovery. In a case such as this, this development came too late. Moving defendants have been prejudiced in that plaintiff's theory arose after the discovery deadline and too late for them to aim dispositive motions based on full discovery. They would also be substantially prejudiced if the court refused to strike the requisite paragraphs of the pretrial order in that substantial discovery would be necessary to respond appropriately to the theory with only a short time remaining before trial.[24] For all of these reasons then,[25] defendants' respective motions to strike are granted.[26]

Hartford and Twin City Fire have not moved to strike, but instead contend that questions of material fact exist as to the issue

22. Smith and Companies admit, however, that they received "initial precautionary notice" of a potential claim regarding the landfill matter in 1988 and that notice was appropriately received in 1988 by Lukis Stewart of Montreal (also known as Lukis Stewart Price Forbes). Thus, they appear only to object to a finding of constructive notice through receipt of notice by Dulaney, Johnston & Priest. Accordingly, the court's ruling is directed at this objection.

23. Smith and Companies has joined in the motions of these defendants. To the extent consistent with the court's discussion on issues with respect to K.S.A. 40–3710, Smith and Companies' motion is granted. However, because the issues present in Smith and Companies' motion vary slightly from that of the other defendants' motions, the court wishes to make clear that unless explicitly granted, any other request of Smith and Companies on this issue is hereby denied by this order.

24. CU and Old Republic also moved to bar any introduction by Cessna at trial or otherwise of "any evidence" against CU or Old Republic regarding notice through WKH. This request is denied. While the court does not expect Cessna to introduce such evidence with respect to issues that no longer remain in the case, the court will not at this time "bar" plaintiff from doing so on off chance that the evidence is pertinent to other relevant issues. Any objections to such evidence will have to be reasserted at trial.

25. The court could well envision a different result in a less unique case. However, under all of the circumstances of this case, the court is persuaded that plaintiff should not be permitted to proceed on this new notice theory to the prejudice of the defendants.

26. Moreover, on the record provided, it is far from clear that the notice provided to WKH and DJ & P, even if they are deemed agents of the insurers for purposes of receiving notice, was sufficient to alert these "agents" that certain insurers or policies would be implicated. It is far from clear that sufficient information was relayed from which it could be found that constructive notice was given pursuant to the Kansas statute or that an agent reasonably could have known to alert the various insurers from the information received. Cf. Fireman's Fund Ins. Co. v. ACC Chemical Co., 538 N.W.2d 259 (Iowa 1995) (letter containing "cc" notation to an insurance broker did not provide adequate notice).

of timely notice regarding the plant facility matter.[27] The court has reviewed the papers and the evidence on this issue and is persuaded that questions of fact do exist with respect to whether notice was timely and whether Hartford and Twin City Fire were prejudiced. The court denies plaintiff's motion for partial summary judgment as to notice as against these defendants. Similarly, defendants Smith and Companies also contend that questions of material fact preclude summary judgment in favor of plaintiff on notice regarding the plant facility matter. The court also finds questions of fact exist on this issue and denies summary judgment as to Smith and Companies as well.

### 6. Liability up to Policy Limits or "Joint & Several Liability"

■ Cessna also moves for partial summary judgment, seeking a declaration as a matter of law that "each policy under which coverage is triggered is liable, up to policy limits, for the full amount of Cessna's losses." Plaintiff contends that if the jury makes factual findings necessary to establish that coverage is provided under any policy or policies at issue, each insurer's contractual obligation to indemnify Cessna for "all sums" would be triggered, resulting in joint and several liability. In response, defendants dispute the applicability of joint and several liability and request the court defer ruling on issues of allocation until trial. The court finds that the extent to which each insurer will be liable for Cessna's alleged losses once coverage is triggered involves mixed questions of law and fact. Plaintiff has not met its burden to show that joint and several liability is appropriate as a matter of law. Moreover, the court agrees with defendants that the prudent course at this point in time is to postpone a ruling with respect to this issue, as the question of whether, and if so how, liability should be allocated among multiple insurers is best sorted out in the context of the

factual development at trial and in the context of the determination of which insurers, if any, are in fact obligated to provide coverage. Plaintiff's motion for partial summary judgment on this issue is denied, and defendants' motion to defer ruling on allocation issues is granted.

### B. Defendants' Motion for Summary Judgment on Plaintiff's "Estoppel" Claim

■ Defendants Hartford, Twin City Fire, Old Republic, CU, US Fire, International, Westport and Allstate (as successor in interest to Northbrook Insurance Company) move for summary judgment on what has been referred to as plaintiff's "estoppel" claim. In the pretrial order, plaintiff asserts that the defendants misrepresented to the Kansas Insurance Commissioner the scope and effect of the pollution exclusion contained in the policies at issue and, as a result, that they are held to that meaning by operation of law and should be equitably estopped from now asserting a contrary position with respect to the meaning of the exclusion. Defendants refute that any misrepresentation was ever made, that the facts in this case support a claim of estoppel and, in addition, refute the notion that plaintiff's estoppel theory is legally valid under Kansas law. For the reasons set forth below, defendants' motion for summary judgment on this claim is granted.[28]

Plaintiff contends that, in 1970, when these defendants added the pollution exclusion to their policies they adopted the language drafted by the Insurance Rating Board (IRB) and that the IRB submitted this exclusion to the Kansas Department of Insurance for approval on their behalf. Plaintiff contends that the IRB represented to Kansas insurance regulators that this exclusion did not limit or restrict available coverage, but merely clarified the definition of a covered

---

27. Defendants apparently do not dispute that timely notice was given to them by Cessna regarding the Obee Road Landfill matter.

28. Because the court grants defendants' motion, it need not reach Hartford's second motion for summary judgment on this claim based on collateral estoppel (Doc. # 468). This motion is, therefore, denied as moot.

occurrence under the policy and that the Kansas Department of Insurance specifically relied on the IRB's explanation in approving the "sudden and accidental" language of the exclusion. Plaintiff seeks to employ the doctrine of equitable estoppel to prevent defendants from asserting a different meaning of the exclusion in this action, namely that the exclusion removes coverage for pollution or contamination damages unless the discharge, dispersal, release or escape, and the resulting damage, was abrupt and of a brief duration.

Plaintiff's theory is based on two state court decisions, *Morton International, Inc., v. General Acc. Ins. Co. of America,* 134 N.J. 1, 629 A.2d 831 (1993) and *Anderson v. Minnesota Insurance Guaranty Assoc.,* 520 N.W.2d 155 (Minn.Ct.App.1994). However, since plaintiff submitted its papers, *Anderson* has, in a notably short opinion, been reversed, leaving *Morton* standing alone as persuasive authority on this theory. *Anderson v. Minnesota Ins. Guar. Assoc.,* 534 N.W.2d 706 (Minn.1995). In *Morton,* the New Jersey Supreme Court held that insurers were estopped to rely on the plain language of the pollution exclusion at issue in this case because the insurers had represented to state regulators that it merely clarified coverage when, in fact, "the clause virtually eliminated pollution-caused property damage coverage." 134 N.J. at 30, 629 A.2d at 848. It allowed insureds to assert an estoppel claim based on statements to state regulators because the IRB's presentation and characterization of the standard pollution exclusion to regulators constituted "virtually the only opportunity for arms-length bargaining by interests adverse to the industry." *Id.* The court found that, by misleading regulators, the IRB "avoided disapproval of the proposed endorsement as well as a reduction in rates" and that "as a matter of equity and fairness" the insurance industry should be bound by the representations of the IRB. *Id.* at 75, 629 A.2d at 874. The court found that to construe the clause in a manner consistent with its literal language and to ignore the industry's misleading presentation would violate New Jersey's strong public policy re-quiring regulation of the insurance business in the public interest and would reward the insurance industry for its nondisclosure. *Id.* at 73–74, 629 A.2d at 873.

The court need not decide whether Kansas courts would follow the reasoning of *Morton* and permit an insured to assert a claim of estoppel based on the insurer's representations to regulators because it finds that, even according to plaintiff's legal theory as asserted, plaintiff has not met its burden to show a genuine issue of material fact exists with respect to this claim.

■ Under Kansas law:

Equitable estoppel is the effect of the voluntary conduct of a person whereby he is precluded, both at law and in equity, from asserting rights against another person relying on such conduct. A party asserting equitable estoppel must show that another party, by its acts, representations, admissions, or silence when it had a duty to speak, induced it to believe certain facts existed. It must also show it rightfully relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts.

*Ram Company, Inc. v. Estate of Kobbeman,* 236 Kan. 751, 761, 696 P.2d 936, 943 (1985). The principle underlying the equitable estoppel doctrine is that a "person will be held to a representation made or a position assumed when otherwise inequitable consequences would result to another who, having a right to do so under all of the circumstances, has in good faith relied thereon." *Coffey v. Stephens,* 3 Kan.App.2d 596, 597, 599 P.2d 310, 312 (1979). While actual fraud, bad faith or an attempt to mislead or deceive is not essential to create an equitable estoppel, it is necessary to show both misrepresentation and detrimental reliance to invoke the doctrine. *Mutual Life Ins. Co. of New York v. Bernasek,* 235 Kan. 726, 730, 682 P.2d 667, 670 (1984).

Plaintiff has not met its burden to point to evidence from which a reasonable juror could infer that the Kansas Department of Insur-

ance (the Department) relied and acted upon the alleged representations of the IRB in approving the "sudden and accidental" language. In the pretrial order, plaintiff claims that the Department approved the sudden and accidental pollution exclusion "based on its understanding that the exclusion did not remove coverage for pollution or contamination damages where the insured did not expect or intend the discharge, dispersal, release or escape" of pollutants into the environment. Defendants, however, have submitted the affidavit of Raymond E. Rathert, who was employed in various positions at the Department from 1957 until his retirement in 1993. Mr. Rathert indicates that he was involved in the 1970–71 approval process for the pollution exclusion along with his supervisor, Russell Brown, and the Insurance Commissioner, Frank Sullivan. He states that when the exclusion was filed, there was no question that "sudden" meant more to them than just "unexpected," that it expressed an element of brevity or a "boom" theory. He further states that it is his opinion that the department was not misled by either the exclusion or the IRB's explanation and that it was "obvious that coverage was being reduced." He states that the Department specifically would not permit the exclusion to be attached to existing policies because, in its opinion, the exclusion potentially reduced coverage. Finally, he states that:

> The exclusion was designed to clarify the insurers' intent to not cover gradual pollution. The current climate of stringent environmental regulation and enforcement appears to be far different from how it was in 1970. The actual reduction in coverage brought about by the exclusion was not thought to be as significant at that time as it is now because there were no known claims paid under this coverage in the State of Kansas ... Because of the lack of claims, there was not sufficient data available to mandate a reduction in premiums. In hindsight, I believe the gradual pollution coverage as interpreted by modern

day courts was not reflected in the then existing rates.

In response, plaintiff submits another affidavit, again one from Mr. Rathert. The relevant portion of that affidavit states:

> When the "sudden and accidental" pollution exclusion was being considered for approval by the Department, representations made by the IRB indicated or implied that coverage for pollution claims would continue where the release, escape, discharge or dispersal of the contaminant was accidental. I believe the Department also understood from the IRB's representations that coverage would continue for damages from pollution where the insured did not expect or intend for the contaminants to be released into the environment.

While plaintiff argues that this affidavit creates a fact question, it neglects to point out that the later affidavit also states unequivocally that Mr. Rathert's "comments are intended to clarify and not amend [his] previous affidavit." The court fails to see how this second affidavit clarifies the previous one, but more importantly, the court does not find that the second, arguably conflicting, affidavit is sufficient to raise a genuine issue of material fact for trial with respect to the reliance element of plaintiff's estoppel claim. Plaintiff has presented no evidence to contradict Mr. Rathert's clear testimony that the Department gave considerable thought to the scope of the pollution exclusion, that it was not misled by the IRB and that it knew gradual pollution was excluded by the policies. It is not even clear from the later affidavit whether the Department's understanding of the meaning of the exclusion differs from the meaning presently attributed to it by the Tenth Circuit and Kansas courts, let alone whether the Department would have acted any differently with knowledge of how the provision is currently interpreted. On this record, a reasonable jury could not find that the Department relied on incorrect or misleading information from the IRB, that it acted on such information or that insureds would now be prejudiced if insurance companies were permitted to espouse the meaning of the pollution exclusion declared by the Tenth Circuit.

"[T]here can be no equitable estoppel if any essential element thereof is lacking or is not satisfactorily proved ... [Estoppel] will not be deemed to arise from facts which are ambiguous and subject to more than one construction, and nothing can be supplied by mere intendment." *Ram Company*, 236 Kan. at 762, 696 P.2d at 944. Defendants' motion on this issue is, therefore, granted.

■ In addition, the court finds that even if Mr. Rathert's second affidavit created a fact question, Kansas courts would nevertheless find the dispute immaterial and otherwise reject plaintiff's attempts here to prevent application of the pollution exclusion based on the doctrine of equitable estoppel as a matter of law. Plaintiff has cited to no case law in Kansas, nor has the court found any, indicating that Kansas law permits an insured to raise an estoppel defense based solely on the reliance of insurers' representations to state regulators, absent any showing of reliance by the individual insured.[29] Plaintiff has presented no evidence that it in fact relied on representations allegedly made by the defendants to the Department, nor has it made any showing that such reliance, if there was any, was reasonable.

Furthermore, the majority of courts addressing this issue since *Morton* have rejected application of the doctrine of equitable estoppel. *See, e.g., Anderson*, 534 N.W.2d at 709–10 (where pollution exclusion has been held to be clear and unambiguous, reliance on any explanations contrary to the unambiguous meaning of the policy language is, as a matter of law, unreasonable); *Goodyear Tire & Rubber Co. v. Aetna Casualty & Sur. Co.*, No. 16993, 1995 WL 422733, at *9–10 (Ohio App. July 12, 1995) (In a cogent analysis

citing to the Restatement (Second) of Torts § 536, the Ohio court rejected the insured's estoppel argument finding that the insured could not justifiably rely upon a filing to regulators to evaluate coverage or to determine whether to purchase or maintain an insurance policy. The court also considered immaterial to the existence of coverage an expression of intent outside of an agreement where the agreement or policy clearly and unambiguously stated that intent. The court found as a matter of law that there can be no justifiable reliance on a statement that is immaterial to the meaning of a provision as expressed in the insurance policy.). The court believes Kansas courts would likely follow this line of cases if faced with the issue.[30]

### C. Defendants' Motion For Summary Judgment Based on the Pollution Exclusion

Defendants Hartford, Twin City Fire, Old Republic, CU, US Fire, International, Allstate and Westport have all moved for summary judgment on the grounds that certain of their policies specifically exclude coverage for pollution of the kind at issue here. They seek summary judgment on plaintiff's claims with respect to both the East Fourth Street Facility (Fluid Power Facility) and the Obee Road Landfill (old municipal landfill). Defendants contend that Cessna habitually and repeatedly polluted the environment for many years and now seeks, improperly, to shift the financial consequences of its actions to its insurance carriers. They contend that the policies specifically exclude coverage for gradual pollution caused by the routine operations of a company over many years and that the uncontroverted facts of this case

---

**29.** On the contrary, the Kansas Supreme Court has shown restraint in invalidating policy provisions approved by the Department of Insurance. *See Hawes v. Kansas Farm Bureau*, 238 Kan. 404, 413, 710 P.2d 1312, 1320 (1985) (The Court held that a life insurance policy provision approved by the Commissioner of Insurance was not contrary to public policy stating: "If the same are to be invalidated, it is a matter best left to the legislature and the Commissioner of Insurance.").

**30.** As additional basis for granting summary judgment in favor of Westport and Allstate

(Northbrook), the court finds that plaintiff has not shown a genuine issue of fact exists as to another element of its estoppel defense, namely that these defendants made any representations to the Department. The uncontroverted evidence indicates that these entities either did not exist until after the alleged statements were made by the IRB or were not members or subscribers to the IRB at the time the statements were made. There has been no showing that the IRB's statements can otherwise be attributed to these defendants.

indisputably fall in this category. By contrast, plaintiff characterizes the pollution at issue as the result of relatively few, discreet, sudden and accidental events in and around the Fluid Power Facility. It specifically refutes defendants' notion that Cessna habitually, regularly or routinely polluted the environment as a part of its operations at its Hutchinson facility. The discreet, abrupt and unexpected events causing pollution in this case, plaintiff contends, do not invoke application of the pollution exclusion of the applicable policies.

Plaintiff does not, however, argue in its papers that the contamination at the landfill was sudden and accidental or that the exclusion is inapplicable. Instead, plaintiff argues only that the defendants are estopped from barring coverage for claims with respect to the landfill based on the exclusion and from asserting a meaning of the exclusion contrary to previous representations to insurance regulators, incorporating by reference its memorandum in response to defendants' motion on plaintiff's estoppel claim. Because the court has already rejected this contention, plaintiff cannot rely on it here. Accordingly, the court grants defendants' motion with respect to the deposit of wastes at the municipal landfill site. The court finds, however, that genuine issues of material fact preclude summary judgment in favor of defendants as to the applicability of the pollution exclusion to contamination at the Fluid Power Facility Subsite.

### 1. The Meaning of "Sudden and Accidental"

The qualified pollution exclusion in the relevant policies provides that there is no coverage for alleged property damage:

arising out of the discharge, dispersal, release or escape of smoke vapors, soot fumes, acids, alkalis, toxic chemical, liquids, or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water, but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

There is no dispute that the property damage claimed by plaintiff arises from the discharge or dispersal of contaminants or pollutants, the only issue is whether the discharge was "sudden and accidental."

The Tenth Circuit and the Kansas Court of Appeals have ruled that the phrase "sudden and accidental" is unambiguous, has a temporal element and that it means an abrupt, as opposed to a gradual, release of pollutants. "If the discharge of pollutants is brief or short, unexpected or unanticipated, not gradual or sustained, and not intended or expected, then the 'sudden and accidental' exception applies." *United States Fidelity & Guar. Co. v. Morrison Grain Co., Inc.,* 999 F.2d 489, 493 (10th Cir.1993); *see also Farm Bureau Mut. Ins. Co. v. Laudick,* 18 Kan. App.2d 782, 785, 859 P.2d 410, 412 (1993) (the term "sudden and accidental" should be given a temporal meaning, is unambiguous, and combines both the elements of without notice or warning and quick or brief in time). Continuous, routine, or gradual discharges of pollutants are not "abrupt" or "quick" and thereby are not "sudden" within the meaning of "sudden and accidental." *Hartford Acc. & Indem. Co. v. United States Fidelity and Guar. Co.,* 962 F.2d 1484, 1486, 1492 (10th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 411, 121 L.Ed.2d 335 (1992).

The Tenth Circuit recently revisited the meaning of the qualified pollution exclusion language at issue here in *Quaker State Minit–Lube, Inc. v. Fireman's Fund Ins. Co.,* 52 F.3d 1522 (10th Cir.1995). The court held that, where pollution is the result of multiple releases over many years, the history of a particular site must be viewed as a whole, and "courts should not engage in a microanalysis of discrete discharges which are claimed to be 'sudden and accidental' when the discharges otherwise arise as commonplace events which occur in the course of daily business." *Id.* at 1529. It concluded that numerous discrete discharges of pollutants during routine business operations form a pattern of discharges that are not "sudden and accidental," and thereby are not within the exception to the pollution exclusion clause. *Id.* (citing *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv.,* 40 F.3d 146, 154 (7th Cir.1994); *Smith v. Hughes Aircraft Co.,*

22 F.3d 1432, 1438 (9th Cir.1993); *Morrison Grain Co.*, 999 F.2d at 493; *A. Johnson & Co. v. Aetna Casualty & Sur. Co.*, 933 F.2d 66, 75 n. 14 (1st Cir.1991); *United States Fidelity & Guar. Co. v. Star Fire Coals, Inc.*, 856 F.2d 31, 35 (6th Cir.1988); *Great Lakes Container Corp. v. National Union Fire Ins. Co.*, 727 F.2d 30, 33–34 (1st Cir.1984)). The fact that individual discharges may have occurred both suddenly and accidentally when viewed in isolation will not alter the conclusion that an overall pattern of discharges was not "sudden and accidental." *Id.* Discharges are not sudden and accidental when they "consisted of long accumulated, unattended, and unsegregated pollutants, and were caused by events not clearly beyond the long-range reasonable expectation of the insured." *Lumbermens Mut. Casualty Co. v. Belleville Indus.*, 938 F.2d 1423, 1427 (1st Cir.1991), *cert. denied*, 502 U.S. 1073, 112 S.Ct. 969, 117 L.Ed.2d 134 (1992); *see also Millipore Corp. v. Travelers Indem. Co.*, 1995 WL 170101 at *4 (D.Mass. Mar. 31, 1995).

Defendant contends that, under the Tenth Circuit standard as announced in *Quaker State Minit–Lube*, the uncontroverted facts of this case establish that coverage is barred by the exclusion.

### 2. Burden of Proof

▮ There is a split of authority as to who bears the burden to show the applicability of the "sudden and accidental" exception. The better rule appears to be that the insured bears the burden of showing that discharge of pollutants was "sudden and accidental." *See Quaker State Minit–Lube, Inc. v. Fireman's Fund Ins. Co.*, 868 F.Supp. 1278, 1312 (D.Utah 1994) (citing *Northern Ins. Co. v. Aardvark Assoc., Inc.*, 942 F.2d 189, 194–95 (3d Cir.1991); *Dakhue Landfill, Inc. v. Employers Ins. of Wausau*, 508 N.W.2d 798, 803 (Minn.Ct.App.1993); *Just v. Land Reclamation, Ltd.*, 151 Wis.2d 593, 445 N.W.2d 683, 688 (Wis.Ct.App.1989); *Fireman's Fund Ins. Co. v. Ex–Cell–O Corp.*, 702 F.Supp. 1317, 1328–29 (E.D.Mich.1988); *Fischer & Porter Co. v. Liberty Mut. Ins. Co.*, 656 F.Supp. 132, 140 (E.D.Pa.1986)), *aff'd*, 52 F.3d 1522 (10th Cir.1995); *see also SCSC Corp. v. Allied Mut. Ins. Co.*, 533 N.W.2d 603, 611–12 (Minn.1995). Placing the burden on the insured is consistent with

the proposition that "in civil cases the burden rests as a general rule 'on the party who substantially asserts the affirmative of the issue.'" *Quaker State*, 868 F.Supp. at 1312 (citing *State in the Interest of N.H.B.*, 777 P.2d 487, 491 (Utah Ct.App.1989) (quoting *Lilienthal's Tobacco v. United States*, 97 U.S. 237, 266, 24 L.Ed. 901 (1878))). It is also consistent with Kansas law. *Cf. Cloud v. Trinity Companies Trinity Univ. Ins. Co.*, 5 Kan.App.2d 437, 617 P.2d 1277 ("The rule which places the burden upon an insurer to prove an exclusion to avoid liability does not apply where what is involved is actually a construction of a coverage clause of the policy."). Thus, the court must determine whether plaintiff has met its burden to show that genuine issues of material fact exist whether the discharge of pollutants at the Fluid Power Facility Site was "sudden and accidental" within the meaning of the policies.

### 3. The Cessna Facility

▮ Defendants have inundated the court with volumes of depositions and exhibits, which evidence they contend establishes the applicability of the sudden and accidental exclusion as a matter of law. Relying on *Quaker State Minit–Lube*, they contend that the evidence of releases at the site cannot fairly be characterized as sudden and accidental because they were numerous, discrete discharges, occurring during routine business operations over a span of thirty years, that constitute commonplace events occurring in the course of daily business. In response, plaintiff argues, and has also presented substantial evidence to show, that the groundwater contamination at the Fluid Power Facility was not the result of routine business practices, but rather the result of several discrete, widely spread accidents in different years between 1959 and 1985, namely a rupture of a line to a TCE bulk storage tank in 1979, two spills at TCE storage tanks, one in 1975 and one in 1983, and ten smaller accidental spills of drums of solvent. Defendants counter that whatever spills or releases Cessna relies on were just part of a larger picture of routine business practices which gradually caused pollution over many years

and, thus, were not sudden and accidental as a matter of law.

■ The court agrees with defendants that the question of whether multiple releases at a site can be isolated and coverage afforded only for those which are characterized as sudden and accidental was settled by the Tenth Circuit in *Quaker State Minit-Lube.* The correct test is whether the release history at the site viewed as a whole can or cannot be characterized as sudden and accidental. On this issue, however, the court believes there to be questions of fact precluding summary judgment against plaintiff.

It was undisputed in *Quaker State Minit-Lube* that contamination at the Ekotek Site resulted from years of storage practices and accidents with used oil that released pollutants into the soil, surface water and groundwater. 52 F.3d at 1530. It was similarly uncontroverted that spills, leaks, accidents and other mishaps with used oil were frequent and familiar occurrences and that pollution occurred as a concomitant of regular business operations. *Id.* The evidence was overwhelming that leaks, spills and accidents were a facet of everyday operations. *Id.* at 1525. Evidence that releases were frequent and familiar occurrences is not undisputed nor is it uncontroverted in this case.

■ To find at this time that releases at the Fluid Power Facility were not sudden and accidental as a matter of law would be tantamount to finding that a manufacturer who handles and uses hazardous chemicals like TCE in the ordinary course of business for lengthy periods of time is automatically precluded from coverage under the qualified pollution exclusion whenever there is a mishap or an unexpected discharge of contaminants. While the court could conceive of substantial policy justifications for such a rule, it does not read *Quaker State Minit-Lube* as standing for such a broad proposition. While the court sees many similarities between the facts of this case and those of *Quaker State Minit-Lube*, it cannot determine at this time that the facts are sufficiently similar to preclude Cessna from any coverage under the defendants' policies as a matter of law.

This issue should be decided in the context of all of the facts at trial. The release history at the Fluid Power Facility must be viewed, not by focusing on any one particular release, for *Quaker State Minit-Lube* clearly prohibits such a narrow inquiry, but by considering the overall business practices of the insured and determining whether contamination and pollution may fairly be characterized as part of the routine operations of the plant. Questions of fact exist whether routine releases from ordinary operations at Cessna's Fluid Power Facility caused contamination of the groundwater or whether the only contamination of the groundwater came from sudden and accidental events. Defendants' motion is for these reasons denied.

## D. Defendants' Motion for Summary Judgment as to The Fourth and Airport Road Subsite

■ Defendants Hartford, Twin City Fire, Old Republic, CU, International, US Fire, Northbrook, Westport, and Smith and Companies move for summary judgment with respect to Cessna's claim for coverage for the Fourth & Airport Road Subsite. Defendants contend that Cessna cannot establish the existence of an occurrence under the defendants' policies with respect to this site and that, even if a question of fact exists as to the existence of an occurrence, coverage is otherwise excluded by the pollution exclusion in defendants' policies as a matter of law.

Plaintiff argues that questions of material fact preclude summary judgment on both issues. It contends that its claims with respect to the Fourth and Airport Road Subsite arise from the KDHE's contention that groundwater contamination emanating from Cessna's former Fluid Power Facility has caused or contributed to the groundwater contamination at the Fourth and Airport Road Subsite. It argues in essence that, because issues of fact preclude summary judgment with respect to occurrences and the application of the pollution exclusion as to the fluid power facility, there can be no determination as a matter of law that defendants are obligated to defend or indemnify Cessna with respect to the Fourth and Airport Road subsite. The court finds that Cessna has not met its burden to show that a genuine issue of material fact exists whether

there was an occurrence within the meaning of any of the defendants' policies with respect to the Fourth and Airport Road Subsite. Cessna has not pointed to any evidence in the record from which a trier of fact could reasonably conclude that the contamination at the Fluid Power Facility also caused contamination at the Fourth and Airport Road Subsite. Defendants' motion is, therefore granted.

In the pretrial order, plaintiff seeks a declaration of coverage under the defendants' policies with respect to the Fourth and Airport Road Subsite. Since Cessna does not dispute that it bears the initial burden to prove that the loss was of a type included in the general provisions of the policies, *Cloud v. Trinity Companies Trinity Univ. Ins.*, 5 Kan.App.2d 437, 617 P.2d 1277 (1980), there can be no dispute that Cessna bears the burden to show that coverage under the policies is triggered. Defendants have met their burden upon summary judgment to show that there is an absence of evidence to support plaintiff's claim of coverage. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). Thus, it is incumbent upon plaintiff to point to evidence in the record indicating a genuine fact issue for trial exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).

Plaintiff has not met this burden. Plaintiff contends that it is the contamination emanating from the Fluid Power Facility that the KDHE claims caused the contamination at the Fourth and Airport Road subsite, and, accordingly, which gives rise to the potential legal liability asserted against Cessna with respect to the Fourth and Airport Road subsite. While plaintiff has presented a letter from the KDHE indicating that this is in fact its claim, plaintiff has not offered any evidence that the KDHE's theory is correct. Plaintiff has not pointed to any evidence from which a reasonable inference can be drawn that any occurrence at the facility is,

in fact, connected to the contamination at the Fourth and Airport Road subsite. Cessna points to no testimony, report or other document in the record to support the KDHE's claim.

Cessna is not required to admit that it is responsible for the contamination at the Fourth and Airport Road subsite, but it is nevertheless required to show that a genuine issue of material fact exists whether its loss with respect to the site falls within the general coverage provisions of the various policies.[31] Because Cessna has not met this burden, summary judgment on this issue is granted in favor of the defendants.[32]

### E. Defendants' Motion for Summary Judgment on Issue of Late Notice

■ Defendants CU, Old Republic, Westport, International, US Fire & Northbrook have all moved for summary judgment on the issue of plaintiff's alleged late notice of claims, demands and occurrences to these insurers. Defendants contend that they did not receive written notice of either alleged occurrences or claims under the respective policies until plaintiff filed this action against them, several years after plaintiff learned that its Fluid Power Facility was a potential source of groundwater contamination in Hutchinson, and that this notice is untimely as a matter of law. Further, they contend that they have, as a matter of law, been substantially and materially prejudiced by this untimely notice and, thus, that they are relieved of the obligation to provide coverage. Plaintiff first contends that it provided timely notice to these defendants between February and June, 1988 through WKH and DJ & P. The court has already ruled, with respect to plaintiff's motion for partial summary judgment, that plaintiff is not entitled to assert this constructive notice theory and, thus, turns to plaintiff's other contentions. In the alternative, Cessna contends that it provided notice as soon as it was reasonably ascertain-

---

**31.** Because the court has found that plaintiff bears the burden to show that relevant releases were "sudden and accidental" within the meaning of the policies, the above analysis equally applies with respect to the qualified pollution exclusion. The court also finds that plaintiff has not met its burden to show an issue of fact exists with respect to the applicability of the exclusion.

**32.** The court recognizes that plaintiff may still have a potential claim under some of the policies for defense costs incurred up to the time of a declaration of no coverage, i.e., this order, with respect to the Fourth and Airport Road subsite. Because the court does not read defendants' motion to have sought summary judgment on this potential claim, it is not reached here.

able that the policies of these defendants would be triggered. Plaintiff contends further that, even if notice was untimely, defendants have failed to demonstrate that they have been actually and materially prejudiced as a matter of law. The court denies summary judgment because it finds that questions of material fact exist whether notice to these defendants was timely and whether these defendants have been prejudiced as a result of the alleged untimely notice.

The notice provisions in the policies at issue obligate Cessna to provide notice to its insurers "as soon as practicable" whenever it has information from which it may reasonably conclude that a covered occurrence involves injury or damage which is likely to involve the policies or to "immediately advise" the insurer of an accident or occurrence which appears likely to result in liability under the policy. The CU policy further provides that if a claim is made or suit is brought against Cessna, Cessna shall "immediately" forward every demand, notice, summons or other process received.

The phrase "as soon as practicable" has been construed under Kansas law to mean that the insured must notify its insurer within a reasonable period of time in view of all the relevant facts and circumstances of a particular case. *Travelers Ins. Co. v. Feld Car & Truck Leasing Corp.*, 517 F.Supp. 1132, 1134 (D.Kan.1981). Similarly, courts generally construe the term "immediately" in this context to require reasonable notice under the circumstances. *See Compagnie des Bauxites de Guinee v. Insurance Co. of North America*, 724 F.2d 369, 374 (3d Cir. 1983) (insurer must be given notice in a reasonable time under the circumstances regardless of the word "immediate"); *Zieba v. Middlesex Mut. Assurance Co.*, 549 F.Supp. 1318, 1320 (D.Conn.1982) (terms such as "immediate" notice as used in insurance policies are "construed to mean and require that reasonable notice be given under the circumstances"); *Gerrard Realty Corp. v. American States Ins. Co.*, 89 Wis.2d 130, 277 N.W.2d 863 (1979) ("the words 'immediately', 'forthwith', 'promptly', and 'as soon as practicable'

all require notice in a 'reasonable time.' "). As a general rule, the issue of late notice involves a question of fact. *Feld Car & Truck Leasing Corp.*, 517 F.Supp. at 1134 (citing *Goff v. Aetna Life & Casualty Co.*, 1 Kan.App.2d 171, 178, 563 P.2d 1073, 1079 (1977)).

The court finds that questions of fact preclude summary judgment with respect to notice. While there is a substantial amount of evidence to indicate that Cessna permitted an unreasonable amount of time to pass before notifying these insurers, the court concludes it falls just shy of warranting judgment as a matter of law at this time.[33] There are factual disputes as to the full extent of Cessna's knowledge of the nature, causes, and, particularly the extent of the pollution at the various sites that counsel against a finding that Cessna acted unreasonably as a matter of law. Moreover, because the issue of timeliness of notice is closely intertwined with the issue of prejudice, as to which the court believes there clearly is a question of fact, the court deems it prudent to reexamine both related issues at trial.

▮▮▮▮ The parties agree that untimely notice, even if a breach of a condition precedent to coverage, is not alone sufficient to excuse performance of the insurer or relieve the insurer of its obligation to provide coverage when coverage otherwise should be afforded. Kansas also requires a showing of actual prejudice as a result of the untimely notice. *Home Life Ins. Co. v. Clay*, 11 Kan. App.2d 280, 286–87, 719 P.2d 756, 762–63 (1986). Prejudice is not presumed and the burden is on the insurer to show that the prejudice is substantial. *Hunt v. Kling Motor Co.*, 841 F.Supp. 1098 (D.Kan.1993); *Feld Car & Truck Leasing*, 517 F.Supp. at 1135–36; *Security Nat'l Bank of Kansas City v. Continental Ins. Co.*, 586 F.Supp. 139, 150 (D.Kan.1982). "When the loss will result from liability owed a third party, the insured is only prejudiced if its ability to defend against that imposition of liability is diminished by the delay." *Clay*, 11 Kan.App.2d at 288, 719 P.2d at 763.[34] Generally, whether

---

33. This issue may be revisited at trial upon a Rule 50 motion if circumstances so warrant.

34. The court agrees with plaintiff that, under Kansas law, an insurer must show prejudice as to its ability to defend the underlying claim. The only Kansas case law arguably addressing the

an insurer has been prejudiced from the failure to provide timely notice is a question of fact, but where the relevant facts are not in dispute it may be determined as a matter of law. *F.D.I.C. v. Oldenburg*, 34 F.3d 1529, 1547 (10th Cir.1994); *Feld Car & Truck Leasing*, 517 F.Supp. at 1135; *Goff v. Aetna Life & Casualty Co.*, 1 Kan.App.2d 171, 178, 563 P.2d 1073, 1079 (1977).

The court finds that many relevant facts with respect to prejudice to the insurers are in dispute and that the issue of prejudice may not be determined as a matter of law. The cases cited by defendants do not mandate a finding of prejudice as a matter of law under the circumstances presented here. Questions of fact exist whether the insurers could have changed the handling of the underlying claim, could have settled it for less or could have taken steps that would have reduced plaintiff's liability. Moreover, there is no basis to conclude as a matter of law that Cessna acted in bad faith in allegedly delaying giving notice. Defendants' motions are, therefore, denied.[35]

### F. Defendants' Motion for Summary Judgment on the Issue of Breach of Contract

▆▆▆▆ Defendants International, US Fire, Westport and CU contend that Cessna incurred costs and entered into settlements and agreements without the insurers' consent or approval in violation of the clear, specific and unambiguous terms and conditions of the issued policies and that, as a result of these breaches of policy conditions, defendants are relieved of providing coverage for Cessna's claims. Defendants contend that a showing of Cessna's breach of these specific provisions, absent any showing of prejudice, is sufficient to relieve them of liability under Kansas law. Even if a showing of prejudice is required, however, defendants contend summary judgment is still warranted as they

have been prejudiced as a matter of law by Cessna's actions. Cessna responds that there has been no breach, that a showing of prejudice is in fact required under Kansas law to relieve the insurers of liability, and that genuine issues of material fact preclude entry of summary judgment at this time. After very careful consideration, the court finds that Cessna has breached the policy provisions at issue, but that if faced with the issue under the circumstances of this case, Kansas courts would require a showing of prejudice in addition to breach, and that issues of fact exist with respect to whether the defendant insurers actually have been prejudiced by Cessna's actions.

The US Fire and International policies at issue give US Fire and International the right to associate with Cessna and any underlying insurers in suits or proceedings which involve or appear to involve these excess carriers. They further provide that, while Cessna is responsible for the investigation, settlement and defense of any claim, Cessna "shall not make or agree to any settlement for any sum, in excess of the underlying insurance, without approval" of the companies and that Cessna shall not incur any costs without the written consent of these companies. The Westport policy similarly provides that Westport shall have the right and be given the opportunity to associate with Cessna or any underlying insurer in the defense and control of any claim, suit or proceeding that reasonably appears likely to involve Westport and that Cessna "shall cooperate in all things in the defense of such claim, suit or proceeding." The CU policy also requires that Cessna "cooperate with the company and assist in making settlements" and prohibits Cessna from voluntarily making any payment, assuming any obligation or incurring any expense other than for "first aid to others." Defendants

---

issue indicates that it is the defense of the underlying claim that is the proper focus in determining *whether there has been substantial prejudice* to an insurer as a result of an insured's breach. *See, e.g., Clay*, 11 Kan.App.2d at 288, 719 P.2d at 762–63.

**35.** Allstate (Northbrook) provided additional papers on the issue of late notice, but the analysis already set forth is equally dispositive of its mo-

tion. Specifically with respect to Northbrook, the court finds that there are questions of fact regarding alleged deficiencies or inadequacies in the notice provided and whether any of the alleged deficiencies prejudiced Northbrook such that it should be relieved of an obligation to provide coverage under the policies. Northbrook's summary judgment motion is, therefore, denied.

contend that Cessna clearly breached these contractual provisions when it entered into settlements and agreed to certain remediation costs without the consent of the moving insurers.

It is apparent to the court that Cessna breached these conditions by entering into the 1990 Obee Road PRP Participation and Organization Agreement and the 1991 Consent Agreement regarding the Fluid Power Facility and by incurring costs associated with the remediation of the Hutchinson sites. It is undisputed that Cessna did not receive approval or consent of any of the moving insurers before entering the agreements or incurring certain costs. Thus, Cessna "made or agreed to a settlement" and incurred costs "without approval" and "without the consent" of US Fire and International in violation of the policies. By not informing Westport of any its actions, Cessna also prevented Westport from any meaningful opportunity to involve itself in the settlement negotiations with the EPA and the KDHE, a right specifically reserved by Westport in these policies. And finally, Cessna violated the "no action" clause of the CU policy when it, of its own accord, incurred costs in connection with the remediation of the Hutchinson sites. Although the pressure to respond in a CERCLA case creates an atmosphere in which the insured's actions in settling may be arguably more coerced (or even prudent) than in other settings, Cessna's actions were voluntary in that it had a choice—it could have made a demand on these insurers to participate or at the very least informed these insurers in advance of its actions. *Roberts Oil Co. v. Transamerica Ins. Co.*, 113 N.M. 745, 751, 833 P.2d 222, 229 (1992).

The question thus becomes, what is the consequence of Cessna's breach. The parties do not cite, nor has the court found, a Kansas case squarely addressing the legal effect of a breach of a voluntary payment provision, nor any case addressing the effect of a breach of a no settlement provision other than in the context of the Kansas uninsured motorist statute. There is, however, significant authority with respect to the effect of an insured's breach of other similar provisions of a comprehensive general liability policy. As already pointed out, Kansas requires a showing of prejudice where there has been a breach of policy provisions with respect to the notice of claims. Similarly, breach of a policy's cooperation clause does not by itself relieve an insurer of responsibility under Kansas law—the breach must cause substantial prejudice to the insurer's ability to defend itself. *Boone v. Lowry*, 8 Kan.App.2d 293, 657 P.2d 64, 70 (1983); *King v. Federal Ins. Co.*, 788 F.Supp. 506, 506–07 (D.Kan. 1992) *aff'd*, 996 F.2d 311 (10th Cir.1993).

In *Roberts Oil Co. v. Transamerica Ins. Co.*, 113 N.M. 745, 751, 833 P.2d 222, 229 (1992), the New Mexico Supreme Court, in an extensive and thoughtful opinion, examined its state's requirement of prejudice with regard to notice and cooperation provisions and concluded that the requirement was equally appropriate with regard to breach of a voluntary payment provision.[36] In doing so, the court, citing to the Restatement (Second) of Contracts § 229, reasoned that where it may be shown that an insurer suffered no material prejudice from an insured's breach of these kinds of provisions, the nonoccurrence of the condition (timely notice, cooperation, etc.) may be excused because it is not,

---

**36.** Both cooperation clauses and proscriptions against incurring costs without the consent of the insurer achieve the same general objectives. *Roberts Oil Co.*, 113 N.M. at 751, 833 P.2d at 229. Voluntary payment provisions "obviate the risk of a covinous or collusive combination between the assured and the injured third party" and "restrain the assured from voluntary action materially prejudicial to the insurer's contractual rights." *Id.* (citing *Augat, Inc. v. Liberty Mut. Ins. Co.*, 410 Mass. 117, 571 N.E.2d 357, 361 (1991)) (purpose of voluntary payment clause is to give insurer opportunity to protect its interests) and *Coil Anodizers, Inc. v. Wolverine Ins. Co.*, 120 Mich.App. 118, 327 N.W.2d 416, 418 (1982) (purpose of voluntary payment provision

is to prevent collusion between the claimant and the insured and to give the insurer control over settlement negotiations); Susan M. Coke, The Law of Hazardous Waste, Management, Cleanup, Liability and Litigation, Vol. 4 § 19.05[2][e] (1995) (such provisions are similarly intended to give insurers the ability to control the defense and settlement of a claim); Robert R. Keeton & Alan I. Widiss, Insurance Law § 7.3, at 780 (1988) (even though negative stipulations in policy that state that the insured shall not voluntarily make any payment or incur expense and prohibit settlements without consent might not be thought of as cooperation provisions, disputes involving those provisions involve essentially the same considerations).

in Restatement terms, a material part of the agreed exchange. *Id.* at 753, 833 P.2d at 230. The court recognized that general liability policies are in the nature of a bilateral, aleatory contract and that the agreed exchange is clearly the insured's payment of a premium for which it receives the insurer's promise to defend and indemnify. It found it absurd to assert in the context of a standard-form comprehensive general liability policy that a promise not to make a voluntary payment was part of the agreed exchange and unsound to approve an automatic forfeiture of coverage because of a breach of such a provision where an insured has dutifully paid the premiums. *Id.* at 753–54, 833 P.2d at 230–31.

■■■ The New Mexico court's rationale is persuasive and appears consistent with Kansas law. By requiring a showing of prejudice with regard to policy notice and cooperation provisions, even where there has been a material breach of those obligations and conditions precedent to coverage, Kansas appears to have, at least implicitly, recognized the essence of the bargain in a general liability policy as an exchange of a promise to pay in return for premiums, and that other promises (such as the promise to cooperate, not to incur costs or to settle without approval) do not necessarily go directly to the heart of the exchange.[37] The court does not believe that Kansas would literally enforce so-called voluntary payment provisions and no settlement provisions where, as in this case, to do so would unfairly permit forfeiture[38] and result in a windfall to the insurer. *See Public Utility Dist. No. 1 v. International Ins. Co.,* 124 Wash.2d 789, 803–04, 881 P.2d 1020, 1029 (1994). Absent a showing of prejudice in addition to the breach, coverage in this case would be unfairly forfeited and the insurers

would appear to receive a windfall. Particularly in a CERCLA case such as this, where the settlement and costs incurred are perhaps less "voluntary" than is ordinarily associated with an insured's settlement or assumption of costs, it seems particularly unfair to permit breach of such provisions to preclude coverage absent a showing of prejudice to the insurer.

Having determined that a showing of substantial prejudice is required, the court turns to whether such a showing has been made as a matter of law. After considering the parties' filings and extensive evidence submitted on this issue, the court finds that there has been no showing of substantial prejudice as a matter of law. Defendants' motion for summary judgment on this issue is, therefore, denied and it will be left to the trier of fact to determine whether defendants have been prejudiced such that they are relieved of an obligation to afford coverage.

### G. Defendants' Motion to Strike

■■■ Defendants Allstate, Hartford, Twin City Fire, Old Republic, Manhattan Fire, Westport, Smith and Companies, International, US Fire and CU all move to strike paragraph 23 of section 8 of the pretrial order. In paragraph 23 of section 8, plaintiff asserts that an issue in the case is:

> whether any defendant insurers had a duty to promptly advise Cessna of their coverage decision upon receiving notice of Cessna's claims; and if so, whether the failure to promptly notify Cessna constitutes a waiver of any right to deny Cessna's claims.

Defendants contend that the pretrial order is the first time Cessna has raised this issue,

---

37. The cases cited by defendants are not to the contrary. In *Benson v. Farmers Ins. Co.,* 227 Kan. 833, 610 P.2d 605 (1980), the plaintiff was insured by Farmers Insurance under an automobile liability policy which included an uninsured motorist endorsement. After being injured in a traffic accident, plaintiff sued the other driver, Mr. Beers. Beers' insurer defended Beers under a reservation of rights because of a coverage dispute. When Benson discovered coverage was disputed, he settled with Beers and the insurance company and later made a demand against Farmers under the uninsured motorist provisions. The Kansas Supreme Court held that the

settlement had significantly impaired Farmer's subrogation right. The Court does not hold or suggest that prejudice is not required for an insurer to be relieved from liability based upon an alleged breach of a no settlement without consent provision. Prejudice to the insurer, i.e., loss of the subrogation right, was in fact a key component to the Court's ruling.

38. Forfeitures of insurance policies are disfavored in Kansas and should be permitted only when expressed in clear and unmistakable terms. *Phico Ins. Co. v. Providers Ins. Co.,* 888 F.2d 663, 669 (10th Cir.1989).

that plaintiff waited too long to assert the contention and, accordingly, that the contention should be struck. They argue that Cessna is actually asserting an estoppel theory and that because they have been deprived of an opportunity to conduct discovery on the issue of prejudice to Cessna due to any alleged delay in advising Cessna of a coverage decision, Cessna should not be permitted to pursue this line.

Plaintiff maintains that its theory is, in fact, waiver and not estoppel and that it was not necessary to specifically state this theory of relief prior to asserting its theories in the pretrial order. It maintains further that its waiver theory concerns only the defendants' rights, or lack thereof, to deny coverage based on defenses related to proper notice and to the defendants' contentions that Cessna breached the insurance contracts by allegedly voluntarily assuming obligations without giving the insurers the opportunity to be involved in the defense and negotiations of the claims made against Cessna by federal and state regulators.

Because plaintiff's theory is asserted in response to the insurers' assertion of particular *defenses* to coverage, the court finds that plaintiff's articulation of its waiver theory was not untimely. Defendants cite no authority for the proposition that plaintiff should have anticipated what the insurers' defenses to coverage would be in order to have included this theory in its complaint or that the failure to do so was prejudicial to defendants. Neither has the court been pointed to any discovery request by defendants which should have prompted plaintiff to disclose this theory.[39] Because plaintiff's waiver theory was a response to particular defenses asserted by the insurers and be-

cause defendants apparently did nothing which required its disclosure earlier, the court finds that it should not be struck from the pretrial order. The court makes no finding with respect to the merits of plaintiff's theory, which defendants have not addressed.

### H. Smith and Companies' Separate Motion for Partial Summary Judgment

■ Defendants Smith and Companies move for partial summary judgment with respect to insurance contracts allegedly issued to Cessna for the period of October 15, 1970 through June 1, 1972. Smith and Companies contend that the undisputed facts establish that the 1970–1972 contracts that Cessna placed at issue in this litigation provided excess liability coverage only for specified aviation risks and did not afford excess general liability coverage or other coverage for the pollution costs at issue in this litigation and that summary judgment should be granted with respect to these policies.

Three policies allegedly issued to Cessna that are of primary consequence in this motion are: Lloyd's Policy Number 112/123749, Policy Number 112/127235 and Policy Number 112/129459. Smith and Companies argues that while policy # 112/123749 originally was to be in effect from October 15, 1969 to October 15, 1972, Cessna and the prescribing insurers agreed at the outset that the contract terms would be renegotiated on October 15, 1970.[40] Defendants contend that the policy terms were in fact renegotiated in those subsequent years and that the renegotiated terms of the policies issued (policies # 112/127235 & # 112/129459) afforded coverage with respect to aviation liabilities only.

---

**39.** Here the situation is in contrast with Cessna's attempt to raise the constructive notice issue after having failed to reveal it in response to various discovery requests.

**40.** Lloyd's Policy # 112/123749, effective beginning October 15, 1979, provides the following:
 The Period of Insurance
 From: 15th October, 1969
 To: 15th October, 1970
 The Assured and Assurers having entered into a Contract of Insurance for the period 15th October, 1969 to the 15th October, 1972, this Policy evidences the terms and conditions of

that Contract as agreed upon for the period 15th October, 1969 to the 15th October, 1970 only.
 It is a condition of the Contract that premium for the period of the Contract 15th October, 1970 to 15th October, 1972 shall be subject to agreement between the Assured and Assurers as at the 15th October, 1970 and the 15th October, 1971.
 It is noted and agreed that further Policies will be issued for the period of the Contract subsequent to the 15th October, 1970 evidencing the terms and conditions agreed upon for such period.

Cessna does not dispute that policies # 112/127235 & # 112/129459 are aviation policies only and do not afford coverage for the claims made in this action. Instead, Cessna contends that policy # 112/123749, the excess general liability policy, remained in effect for three years, that its renegotiated terms did not differ substantially from the terms effective for the first year, that it affords coverage for claims throughout the three years it was in effect, and that it was purchased in addition to the aviation policies Smith and Companies refers to.[41]

Considering all the evidence with respect to this issue, the court finds that plaintiff has met its burden to show that genuine issues of material fact exist whether the terms of policy # 112/123749 remained substantially in effect for three years in addition to coverage afforded by the aviation policies from 1970 through 1972. The policy was initially issued for a three year period. The existence of endorsements [42] attached to the policies dated 1970 and 1971 could reasonably give rise to the inference that premiums for the policy were recalculated, but that the policy terms remained substantially in effect through 1972. Summaries of Cessna's insurance coverage prepared by an employee and the testimony of that employee, taken together and considered in the light most favorable to plaintiff, could reasonably give rise to the inference that policy # 112/123749 remained in effect for three years.[43] In short, while the court is not overwhelmed by plaintiff's evidence in this regard, it does find that plaintiff has met its burden to set forth specific facts which show that there is a genuine issue for trial. Smith and Companies' motion is, therefore, denied.

---

**41.** The London insurance market uses a document called a "slip," which evidences the existence of an insurance contract, provides generally the type of insurance purchased and indicates the underwriters who participated in the risk. It also shows premiums and bare information about the contract but does not indicate the specific terms or conditions of the policy. The original slip for policy # 112/123749 states that the policy is for excess comprehensive personal injury and property damage liability insurance. The slip also states that the policy is effective beginning October 15, 1969 for a period of 36 months. Policy # 112/123749 replaced policy # 111/112799, a prior three year policy effective from October 15, 1966 to October 15, 1969. Another copy of a slip for policy # 112/123749 is stamped with the dates "APR 1970," "APR 1971" and "APR 1972."

**42.** Attached to policy # 112/123749 are several endorsements. One dated September 6, 1971 states:

It is understood and agreed that the Assured declaration for the policy period was as follows:—

1. *Respect Cessna Aircraft Company & McCauley Industrial Corporation:* Civilian $107,119,544 at .60 per 1,000 = $64,271.73

Military $65,958,677 at .55 per 10,000 = $3,627.73 ...

As a result of the foregoing the Earned Premium amounts to $71,015.88. Policy subject to a Minimum Premium of $75,000 and....

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Another endorsement dated December 11, 1970 stated similarly:

It is understood and agreed that the Assureds declaration of the policy period was as follows:

1. *Respect Cessna Aircraft Company & McCauley Industrial Corporation:* Civilian....

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

**43.** Ms. Lucille Brunton, a Cessna employee between 1942 and 1990, personally prepared summaries of Cessna's insurance coverage on an annual basis using information copied directly from the insurance policies. On a form originally prepared in 1969, Ms. Brunton indicated that Lloyds provided coverage for "legal liability in excess of all primary liability policies." Handwritten notes on this summary indicate an expiration date of October 15, 1972.