Energynorth v. Associates          CV-97-064-M   09/29/00
                    UNITED STATES DISTRICT COURT

                      DISTRICT OF NEW HAMPSHIRE


EnergyNorth Natural Gas, Inc.,
     Plaintiff

     v.                                   Civil No. 97-64-M
                                          Opinion No. 2000 DNH 210
Associated Electric & Gas
Insurance Services Limited, et al.,
     Defendants


                            **O R D E R**


     Plaintiff EnergyNorth Natural Gas, Inc. (ENGI) brought this

action for declaratory judgment, breach of contract, and breach

of the implied obligation of good faith and fair dealing in every

New Hampshire contract, against eighteen named insurance

companies for their failure to defend and indemnify ENGI against

environmental liability associated with a site in Laconia, New

Hampshire.  The only defendants against whom the action remains

pending are Certain Underwriters at Lloyd's, London and Certain

London Market Insurance Companies (collectively, LMI).  The

following dispositive or partially dispositive motions are now

before the court: (1) Motion of Defendants American Home

Assurance Company, Lexington Insurance Company, and National

Union Fire Insurance Company of Pittsburgh, Pa., for Partial Summary Judgment with respect to Plaintiff's Costs to Investigate and Remediate Contamination on its Own Property (document no. 149), in which LMI have joined; (2) Motion of Defendants American Home Assurance Company, Lexington Insurance Company, and National Union Fire Insurance Company of Pittsburgh, Pa., for Partial Summary Judgment as to Costs Not Incurred as "Damages" (document no. 150), in which LMI have joined; (3) ENGI's Motion for Partial Summary Judgment regarding Policies which Contain "Sudden and Accidental" Pollution Exclusion Clauses (document no. 151); (4) Defendants St. Paul Fire and Marine Insurance Company and LMI's Motion for Summary Judgment on the Absence of an Accident, Occurrence, or Fortuity under the Policies at Issue (document no. 152); (5) LMI's Motion for Summary Judgment based on the Property Damage Exclusion (document no. 153); (6) LMI's Motion for Summary Judgment regarding Allocation (document no. 154); (7) LMI's Motion for Summary Judgment regarding Trigger of Coverage (document no. 155); and (8) LMI's Motion for Summary Judgment based on the Pollution Exclusion (document no. 156).

2

<u>Standard of Review</u>

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When ruling upon a party's motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." <u>Griggs-Ryan v. Smith</u>, 904 F.2d 112, 115 (1st Cir. 1990).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). If the moving party carries its burden, the burden shifts to the nonmoving party to demonstrate, with regard to each issue on which it has the burden of proof, that a trier of fact could reasonably find in its favor. <u>DeNovellis v. Shalala</u>, 124 F.3d 298, 306 (1st Cir. 1997).

At this stage, the nonmoving party "may not rest upon mere allegation or denials of [the movant's] pleading, but must set forth specific facts showing that there is a genuine issue" of material fact as to each issue upon which he or she would bear the ultimate burden of proof at trial.  Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." Intern'l Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Center, 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).


### Background[1]

The environmental damage at issue arose out of the operation of a manufactured gas plant at a site in Laconia, New Hampshire,

---

[1]The following facts are taken primarily from the Joint Defendant Insurers' Local Rule 7.2(b) Common Statement of Material Facts as to which there is no Genuine Issue to be Tried (document no. 157), in conjunction with ENGI's Objection to the Defendants Statement of Material Facts as to which there is no Genuine Issue to be Tried (document no. 205).  Unless otherwise noted, the facts recited herein are undisputed.

now known as the Messer Street Manufactured Gas Plant (MGP) Site (the Site).[2]  The Messer Street MGP began operating in 1894, producing gas for heating, lighting, and cooking, using the Kendall Oil Gas Process and later (from 1902 to 1952), the Carburetted Water Gas Process.  Both processes produced byproducts, including tar, that constitute the alleged source of the environmental contamination at issue.

The Messer Street MGP passed through a succession of owners between 1894 and 1945, consisting of the Laconia Gas Light Company from April 1894 to March 1897; the Winnipesaukee Gas & Electric Company from March 1897 to April 1910; the Laconia Gas & Electric Company from April 1910 to August 1926; and Public Service Company of New Hampshire (PSNH) from August 1926 to October 1945.  In October 1945, the plant was acquired by ENGI's

---

    [2]The Messer Street site actually consists of two parcels, only one of which was owned by ENGI's predecessor-in-interest. For purposes of this order, however, distinction between the site and its subparcels is unnecessary, and the term "Site" will be used to refer to the either the entire Messer Street site or the subparcel owned by ENGI's predecessor-in-interest, as the context requires.

predecessor-in-interest, Gas Service, Inc.,[3] which owned the Site until 1981. Gas Service, Inc. continued using the Carburetted Water Gas Process to produce gas at the plant until March 4, 1952, when an explosion destroyed the plant's gas generator house. After that date, Gas Service, Inc. demolished the old MGP and installed a propane air gas system that utilized propane gas brought to the site by railroad; gas was never again manufactured at the Site using the Carburetted Water Gas Process.

In 1993, the New Hampshire Department of Environmental Services (NHDES) inspected the Winnipesaukee River adjacent to the Site and discovered globules of coal tar on the river bottom. DES notified ENGI and PSNH that they were potentially responsible parties with respect to the contamination. Pursuant to a NHDES directive, ENGI and PSNH conducted a site investigation of the Site and river and prepared a Site Investigation Report and a Remedial Action Plan. ENGI alleges that it has spent over $180,000 on its investigation at the Site and that it expects to

---

[3]Plaintiff's complaint alleges that "[o]n or about October 1, 1988 the Concord Natural Gas Corporation and the Manchester Gas Company merged with Gas Service, Inc., which changed its name to EnergyNorth Natural Gas, Inc." (Compl. ¶ 48.)

incur significant expenses for further investigation and remediation. It further alleges that the defendant insurers, including the remaining defendants LMI, are obligated under their applicable insurance contracts with ENGI to defend it against the NHDES directive, and indemnify it for expenses incurred and to be incurred in conducting response actions at or near the Site. ENGI finally alleges that the insurers have failed to provide such defense and indemnity.

## Discussion

The court will first address LMI's Motion for Summary Judgment regarding Trigger of Coverage (document no. 155). LMI argue that they are entitled to summary judgment because their policies were not issued until after gas manufacturing operations at the Site were discontinued. LMI argue that their policies cover only damages "caused by accident" during the policy period or arising out of a "causative event" during the policy period, and that there could be no accident or causative event to trigger coverage after the pollution-causing operations at the plant ceased. ENGI counters that the policies cover the continuing

7

contamination of, or damage to, the property that occurred during the policy periods.

LMI issued policies to Gas Service, Inc. covering periods between 1958 and 1979. The coverage grant in each of these policies was one of two types. The first, appearing in policies covering periods between 1958 and 1960 reads as follows:

> WE THE UNDERWRITERS hereby agree, subject to the terms, conditions and limitations hereinafter mentioned, to indemnify the Assured in respect of accidents occurring during the policy period commencing [policy commencement date] and ending [policy end date] for any and all sums which the Assured shall by law become liable to pay and shall pay or by final judgment be adjudged to pay to any person or persons (excepting employees of the Assured injured during the course of their employment) as damages
>
> > (a) for bodily injuries, including death at any time resulting therefrom caused by accident, hereinafter referred to as "Bodily Injury", and
> >
> > (b) for damage to or destruction of property of others (excluding property under the Assured's care, custody or control) caused by accident, hereinafter referred to as "Property Damage",
>
> > arising out of the hazards covered by and as defined in the underlying policy/ies specified in the Schedule herein and issued by the [Primary Insurers' Names], hereinafter called the "Primary Insurers", . . . .

8

. . .

> 1. ACCIDENT. The word "accident" shall be
> understood to mean an accident or series of
> accidents arising out of one event or occurrence.

(ENGI's Insurance Policy Tome at 1 (internal quotation marks omitted).) The court will adopt ENGI's terminology in referring to these policies as the "accident-based" policies.[4]

The second type of coverage grant, appearing in policies covering periods between 1962 and 1979, reads as follows:

<u>EXCESS PUBLIC LIABILITY AND PROPERTY DAMAGE</u>

> 1. The Underwriters agree to indemnify the Insured
> named herein and/or any associated, affiliated or
> subsidiary companies or corporations or interests . . .
> for any and all sums which the Insured shall by law
> become liable to pay and shall pay or by final judgment
> be adjudged to pay, or which by agreement between the
> Insureds and the Underwriters or their representatives
> shall be paid to any person, firm, corporation,
> association, government, governmental division or
> governmental instrumentality, . . . as damages . . . to
> property (excluding damage to property owned by the
> Insured) by reason of an occurrence resulting from or
> because of the Insured's business, ownership,
> maintenance, operation, use of or liability for
> properties of all kinds and nature, or any act or
> omission of the Insured's agents or employees or
> contractors or sub-contractors it being understood and

---

[4]LMI uses the name "caused by accident" policies.

agreed that the term "occurrence" shall mean one happening or series of happenings arising out of or due to one event.

. . .

4.   This policy covers the Liability of the Insured under agreements with any person, firm, corporation, association, government, governmental division, or governmental instrumentality, whether incorporated or not, whereby the Insured has agreed to assume responsibility or liability for personal injuries or damage to property (whether such agreements are now in effect or become effective while this Policy is in force) notwithstanding that claims may be made or suits commenced against such other person, firm, corporation, association, government, governmental division, or governmental instrumentality, whether incorporated or not, provided always, however, that no liability shall attach to the Underwriters by virtue of this paragraph, in respect of any event which occurred prior to the attaching date of this policy,

      . . .

This policy commences at 12.01 a.m. Standard Time [commencement date] and ends at 12.01 a.m. Standard Time [termination date] and shall apply to occurrences happening during the currency hereof.

(ENGI's Insurance Policy Tome at 2 (internal quotation marks omitted).)[5]  The court will adopt ENGI's terminology in referring to these policies as the "occurrence-based" policies.[6]

In determining whether these provisions afford coverage to ENGI under the circumstances of this case, the court applies the rules governing the interpretation of insurance policies under New Hampshire law.  See LaSorsa v. UNUM Life Ins. Co., 955 F.2d 140, 147 (1st Cir. 1992).  Under New Hampshire law, the interpretation of insurance policy language is a question of law to be decided by the court.  See, e.g., High Country Assoc. v. New Hampshire Ins. Co., 139 N.H. 39, 41 (1994).  "In general, the rules governing the construction and interpretation of written contracts apply with equal force to insurance policies.  Thus, in interpreting contracts, the fundamental inquiry centers on determining the intent of the parties at the time of agreement." Trombly v. Blue Cross/Blue Shield of New Hampshire - Vermont, 120 N.H. 764, 770 (1980)(citation omitted).

---

[5]Later quotation in this opinion of portions of these policy excerpts will be made without further attribution.

[6]LMI uses the name "causative event" policies.

11

In interpreting an insurance policy, "the court must consider the policy as a whole." Trombly, 120 N.H. at 768. The court first determines whether the disputed policy language is ambiguous, State Farm Mut. Auto. Ins. Co. v. Cookinham, 135 N.H. 247, 249 (1992), that is, whether "the contracting parties could reasonably disagree about its meaning or application," Whitcomb v. Peerless Ins. Co., 141 N.H. 149, 151 (1996).

> Where disputed terms are not defined in the policy or by State judicial precedent, [the court] construe[s] them in context and in the light of what a more than casual reading of the policy would reveal to an ordinarily intelligent insured. This is an objective standard. Where the terms of a policy are clear and unambiguous, we accord the language its natural and ordinary meaning.

Concord Hosp. v. New Hampshire Med. Mal. Joint Underwriting Ass'n, 137 N.H. 680, 682-83 (1993)(citations and internal quotation marks omitted).

Where the language is ambiguous, it will be presumptively construed in favor of the insured. See Trombly, 120 N.H. at 771-72; Town of Epping v. St. Paul Fire and Marine Ins. Co., 122 N.H. 248, 252 (1982). The presumption may be rebutted, however, and "will not be applied so as to create coverage where it is clear

that none is intended." Town of Epping, 122 N.H. at 252 (internal quotation marks omitted). Finally, by statute, the insurer bears the burden of proof in any declaratory judgment action brought under N.H. Revised Statutes Ann. § 491:22 to determine coverage under a liability insurance policy, regardless of whether the insurer or the insured brought the action.[7] N.H. Revised Statutes Ann. § 491:22-a (1997).

With respect to the accident-based policies, LMI argue that they require both the causative event and the resulting damage to occur during the policy period. ENGI, on the other hand, argues that the accident-based policies are triggered when damage occurs during the policy period, even if the causative event occurred outside the policy period. The dispute focuses on the meaning of the term "accident," as the accident-based policies obligate LMI "to indemnify the Assured in respect of accidents occurring during the policy period." (Emphasis added.) The court must therefore first decide whether the term "accident" as used in the

_____

[7]ENGI's complaint seeks declaratory judgment under both the state and federal declaratory judgment statutes. See generally EnergyNorth Natural Gas, Inc. v. Associated Electric & Gas Ins. Servs., Ltd., 21 F. Supp. 2d 89 (D.N.H. 1998) (discussing use of the state declaratory judgment statute in a similar case).

policies is ambiguous.  See, e.g., Cookinham, 135 N.H. at 249 ("In interpreting the policy, we first determine whether the language at issue is ambiguous").

Although the policies purport to define "accident" to "mean an accident or series of accidents arising out of one event or occurrence," id., the definition is unenlightening.  The court therefore looks to whether the term is defined in New Hampshire law.  See Coakley v. Maine Bonding and Cas. Co., 136 N.H. 402, 409-10 (1992) ("An insurance contract is interpreted according to state law, and where judicial precedent clearly defines a term at issue, we need look no further than that definition.").  The New Hampshire Supreme Court has defined the term "accident," as used in occurrence-based policies, as "an undesigned contingency, . . . a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated, and not naturally to be expected."  Vermont Mut. Ins. Co. v. Malcolm, 128 N.H. 521, 523 (1986)(internal quotation marks omitted).  That definition is also not particularly helpful, however, because the question at hand is not so much what an accident is, but when it has occurred.

14

ENGI urges the court to follow the decision in EnergyNorth Natural Gas, Inc. v. Associated Electric & Gas Insurance Services, Ltd., ("Associated Electric") C-95-591-B (D.N.H. Sept. 30, 1998). There, citing Peerless Ins. Co. v. Clough, 105 N.H. 76 (1963), the court found it "certainly plausible to follow the general rule and construe the policies to provide that an accident occurs when the injury occurs rather than when the insured commits the act that later produces the injury." Associated Electric, slip op. at 23 (D.N.H. Sept. 30, 1998). Since this interpretation favored the insured, the court rejected the insurer's contrary construction and held that the policy's accident-based language "embodies the theory proposed by EnergyNorth - that where damage occurs in multiple policy periods, coverage is triggered under each active policy when the damage occurs, as long as damage occurs." Id.

As noted, the Associated Electric decision was based on Peerless Ins. Co. v. Clough, 105 N.H. 76 (1963). There, the insurer claimed that it was not required to defend or indemnify the insured against claims arising out of fires caused by his negligent construction of fireplaces. The insurer relied on a

15

policy exclusion as to "property in the 'care custody or control of the insured or property as to which the insured for any purpose is exercising physical control.'" Id. at 78. The properties in question were in the custody or control of the insured at the time he negligently constructed the fireplaces but not at the time the fires occurred. In holding that the exclusion did not apply, the court stated that "the majority - and we believe the better rule  - is that the time of the occurrence resulting in the loss or damage, and not the time of the negligence, determines whether there is coverage under the policy." Id.

The court does not read Clough to hold categorically that the time injury or damage occurs is the time of the occurrence under an occurrence-based policy,[8] or, a step even further removed, the time of the accident in an accident-based policy.[9]

_____

[8]The policy at issue in Clough insured against "'destruction of property'" and "'applie[d] only to occurrences during the policy  period.'" Id.

[9]It may be noted that although caselaw cited by the Clough court stated more explicitly that "[t]he general rule is that the time of the occurrence of an accident within the meaning of an indemnity policy is not the time the wrongful act was committed, but the time when the complaining party was actually damaged,"

16

To illustrate, there are number of actions or events that may occur, either simultaneously or separated by some span of time, that bring about an insured loss.  There may be a negligent act, an injury-producing event, and injury or damage.  In Clough, the negligent act (construction of the fireplaces) occurred first and, some time later, the injury-producing event (the fire) and the resulting damage occurred relatively simultaneously.  The Clough court held that the injury-producing event, and not the prior - and separate - negligent act, triggered coverage.  The court did not explicitly differentiate between the fire and the resulting damage, presumably because of their contemporaneous occurrence.[10]

---

Remmer v. Glens Falls Indem. Co., 295 P.2d 19, 21 (Cal. Dist. Ct. App. 1956), Clough itself held that "the time of the occurrence resulting in the loss or damage . . . determines whether there is coverage under the policy."  Clough, 105 N.H. at 78 (emphasis added).

[10]The court did, however, contrast both with the negligent act:  "Furthermore, in the case before us the event insured against is 'destruction of property' and not negligence, and it is expressly stated under the heading 'Policy Period' that "This policy applies only to occurrences during the policy period."  Id.

In the instant case, the allegedly negligent act (the release of contaminating waste into the environment) occurred sometime prior to the cessation of manufacturing operations in 1952. The injury is allegedly of a continuing nature and the court will assume, for purposes of this motion, that it occurred throughout the policy periods at issue here. Although the court has analyzed the issue somewhat differently than the parties, LMI's position essentially comports with an argument that the injury-producing event is the same as the negligent act (i.e., the initial release of waste) and ENGI's position essentially contemplates that the injury-producing event can be the continuous leaking or leaching of the toxic waste, and is thus indistinguishable from the injury itself.

New Hampshire law supports LMI's position. In <u>United States Fidelity & Guar. Co., Inc. v. Johnson Shoes, Inc.</u>, 123 N.H. 148, 151 (1983), the New Hampshire Supreme Court addressed a case in which an insurer denied coverage for environmental contamination, claiming that no occurrence had happened during its policy period. The insurer, United States Fidelity & Guaranty Company, Inc. (USF&G), provided coverage to Johnson Shoes, Inc. during the

18

approximately twenty year period Johnson Shoes was in business, a period that ended in November, 1972. "In August 1973, after a period of heavy rains, oil which had apparently escaped from an underground storage tank located on . . .premises [leased by Johnson Shoes], spilled over onto neighboring property up to one-half mile away." Id. at 151. Evidence showed that the tank had been leaking as early as 1971, when a maintenance man for Johnson Shoes reported a suspected leak to his superiors. USF&G argued that "the 'occurrence' which gave rise to the underlying claims took place in August 1973, after the policy issued to Johnson Shoes, Inc. had been cancelled [sic]." Id. at 153. The court, however, affirmed the trial court's ruling that "the 'occurrence' took place no later than November 1971, during the coverage period." Id.[11]

Citing Johnson Shoes, this court (Devine, J.) held that "in cases involving the delayed manifestation of environmental contamination, New Hampshire follows the rule that the time of

_____

[11]The policy at issue defined "occurrence" as "'an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the Insured.'" Id.

19

the occurrence is the time of the wrongful act which caused the ultimate damage." Town of Peterborough v. The Hartford Fire Ins. Co., 824 F. Supp. 1102, 1111-12 (D.N.H. 1993). The court therefore granted summary judgment to the insurers with respect to a policy providing coverage from February 1, 1971, to February 1, 1974, where the insured "d[id] not allege that hazardous substances were deposited at the site . . . after 1970." Id. at 1104.

The court follows Town of Peterborough rather than Associated Electric and holds that under New Hampshire law, the term "accident" as used in the policies refers to the initial release of hazardous material at the Site rather than to later continuing damage or migration of the hazardous wastes. Therefore, LMI are entitled to summary judgment with respect to the accident-based policies.

The occurrence-based policies provide, after specifying the policy period, that they "shall apply to occurrences happening during the currency hereof." They further provide that the underwriters will indemnify the insured against liability for damages to property "by reason of an occurrence . . . it being

understood and agreed that the term 'occurrence' shall mean one happening or series of happenings arising out of or due to one event."[12]

LMI argue that this language requires that the causative event occur during the policy period.  In other words, LMI contend that coverage under the policies is not triggered by damage occurring during the policy period that is caused by an event that happened outside the policy period.  ENGI, on the

_____

[12]ENGI argues "it appears from LMI's filing that only the first layer London policies from 1962 to 1972 contained this occurrence definition.  It is unclear how many, if any, higher layer policies contained this 'occurrence' definition."  (ENGI's Mem. of Law in support of Obj. to Mot. for Summ. J. (document no. 203) at 4 (citation omitted).)  ENGI also contends that some of the policies contained no definition of the term "occurrence." Id.  The court notes, however, that ENGI's own Insurance Policy Tome lists 34 LMI policies, with dates from 1962 through 1979, that purportedly contain this language.  Furthermore, LMI counters that "each higher excess LMI policy at issue in this case 'follows form' to the term[s] and conditions of the first layer LMI policy it sits above, all of which first layer policies contain the same 'causative event' definition of occurrence." LMI's Mem. of Law in Resp. to ENGI's Mem. of Law in Support of its Mot. For Summ. J. (document no. 212) at 3.  As ENGI did not contest this representation in its further objection to LMI's motion, the court will accept LMI's assertion that "every LMI policy at issue in this action insuring ENGI during the period 1962 to 1979 contains or follows form to the same 'causative event' occurrence definition that is delineated in LMI's Trigger Memorandum."  Id.; see also Aff. of Allen R. McKay, Esq.

21

other hand, argues that this language provides coverage whenever an occurrence results in property damage, and therefore employs a continuous trigger of coverage.

LMI cite a number of cases in support of their "causative event" argument, including Babcock & Wilcox Co. v. Arkwright-Boston Mfg. Mut. Ins. Co., 53 F.3d 762 (6th Cir. 1995); Indiana Gas Co., Inc. v. Aetna Cas. & Sur. Co., 951 F. Supp. 780 (N.D. Ind. 1996), vacated for lack of diversity jurisdiction, 141 F.3d 314 (7th Cir. 1998), cert. denied sub nom. Certain Underwriters at Lloyd's London v. Indiana Gas Co., Inc., 525 U.S. 931 (1998); and Public Services Electric and Gas Co. v. Certain Underwriters at Lloyd's of London, Civ. Action No. 88-4811(JCL) (D.N.J. Sept. 30, 1994). Each of the cases interpreted a definition of "occurrence" in an occurrence-based policy as requiring that "the event, not the happening, must occur during the term of the contract." Babcock & Wilcox, 53 F.3d at 766 (internal quotation marks omitted). Thus, as applied to potential coverage for environmental consequences of gas manufacturing operations in Indiana Gas Co., this interpretation compelled granting summary judgment in favor of LMI with respect to policies that were not

in effect at the time the gas plant operated.  <u>Indiana Gas Co.</u>, 951 F. Supp. at 789; <u>see</u> <u>also</u> <u>Public Services Electric and Gas Co. v. Certain Underwriters at Lloyd's of London</u>, Civ. Action No. 88-4811(JCL), slip op. at 13 (D.N.J. Sept. 30, 1994) (granting summary judgment to LMI with respect to policies that came into effect after the insured had ceased its gas manufacturing operations).

LMI argue in favor of the same result here.  The court notes, however, that the definitions of "occurrence" construed in the cases cited by LMI differ materially from that at issue here.  In <u>Public Services Electric and Gas Co.</u>, for instance, the policy provided that "The word 'occurrence' shall be understood to mean 'one happening or series of happenings arising out of or caused by one event taking place during the term of this contract.'" <u>Public Services Electric and Gas Co.</u>, Civ. Action No. 88-4811(JCL), slip op. at 11 (D.N.J. Sept. 30, 1994) (internal quotation marks omitted).  Although the definitions in the other cases differ slightly, each contains the phrase "taking place

during the term of this contract" following the word event.[13] That limiting phrase does not appear in the policy definition at issue here. Cf. In the Matter of the Liquidation of Midland Ins. Co., 623 N.Y.S.2d 689, 694 (N.Y. Sup. Ct. 1994) (noting, although construing different policy language, that the insured "has not convinced this Court that the presence of the 'during the policy period' language outside of the definitions of 'bodily injury' or 'occurrence' is a trivial matter of punctuation, since the entire meaning of the term 'occurrence' is changed thereby").

The policies here provide that "the term 'occurrence' shall mean one happening or series of happenings arising out of or due to one event." The court finds that this definition, read in conjunction with the provision that the policies "shall apply to occurrences happening during the currency hereof," is ambiguous. It is not clear whether both the "happening or series of

_____

[13]See Babcock & Wilcox, 53 F.3d at 766 ("The term 'Occurrence' whenever used herein, shall mean any happening or series of happenings, arising out of or due to one event taking place during the term of this contract in respect to all the Assured's operations.'"); Indiana Gas Co., 951 F. Supp. at 787 ("The term 'occurrence' whenever used herein shall mean one happening or series of happenings, arising out of or due to one event taking place during the term of this contract.").

24

happenings" and the "event" must take place during the policy period or whether only the "happening or series of happenings" must take place during the policy period regardless of when the "event" occurs. Cf. Midland Ins. Co., 623 N.Y.S.2d at 693 (noting, in reading the definition of occurrence into the coverage grant, that "[i]f there is any ambiguity in this language, it is as to whether only the event (or continuous exposure) need happen during the policy period, or whether both exposure and injury need be present during the policy period").

The definition could reasonably be read either way. Moreover, cases cited by LMI indicate that the latter possible interpretation may provide coverage. The Public Services Electric and Gas Co. court found:

> [T]he "event" alluded to in the policy definition
> refers to the contamination itself, such as a leak or a
> spill, and not to any subsequent leaching or migration
> of contaminants. Rather, under the definition leaching
> or migration would qualify as the "happening or series
> of happenings arising out of . . . [the] event."

Public Services Electric and Gas Co., Civ. Action No. 88-4811(JCL), slip op. at 12-13 (D.N.J. Sept. 30, 1994). So, the definition of occurrence in the policies is ambiguous under New

25

Hampshire law.  See Green Mt. Ins. Co. v. George, 138 N.H. 10, 14 (1993) ("If . . . the policy language is reasonably susceptible of at least two different interpretations, one of which favors coverage, the language is ambiguous.")

Ordinarily, an ambiguity such as that presented here would be construed in favor of the insured to provide coverage.  See, e.g., Trombly, 120 N.H. at 771-72.  LMI, however, raise an additional argument that must be addressed before determining whether the Trombly presumption applies.  Specifically, LMI contend that the definition of occurrence must be read in light of paragraph four of the coverage grant, which provides that the policy covers liability that the insured assumes under an agreement taking effect before or during the policy period, "provided always, however, that no liability shall attach to the Underwriters by virtue of this paragraph, in respect of any event which occurred prior to the attaching date of this policy."  LMI argue that "[b]ecause a single coverage grant can only have one trigger of coverage, this language in the . . . coverage grant confirms that the policy is triggered by causative events taking

26

place during the term of the contract." (LMI's Mem. of Law in support of Mot. for Summ. J. (document no. 155) at 8.)

Under New Hampshire law, a court interpreting an insurance policy "must consider the policy as a whole," Trombly, 120 N.H. at 768, and "constru[e] all parts of the policy together in accordance with the rule of construction of contracts," Lumbermen's Mut. Cas. Co. v. McCarthy, 90 N.H. 320, 323 (1939). Paragraph four appears to clarify the grant of coverage in paragraph one by stating that the policy covers liability assumed by the insured under pre-existing agreements or agreements entered into while the policy is in force. The "provided always, however" clause, in turn, appears designed to confirm that paragraph four does not expand the coverage grant of paragraph one to liability for pre-policy period events otherwise contractually assumed by the insured. Thus, LMI argue, paragraph four also confirms that coverage under paragraph one is triggered only by events occurring during the policy period, thereby clearing up the ambiguity in the definition of occurrence.

Paragraph four certainly makes LMI's interpretation more plausible. ENGI neither contests nor even addresses the point.

27

Thus, while the language of paragraph four is not a model of clarity, no alternative construction has been suggested that could reasonably be read in favor of coverage. "It is true that the insurer bears the burden of proving lack of coverage, . . . [and] that ambiguities are generally construed against the insurer . . . . Ambiguity, however, serves to aid the policyholder only if one of the possible meanings of the clause at issue favors coverage." International Surplus Lines Ins. Co. v. Manufacturers & Merchants Mut. Ins. Co., 140 N.H. 15, 19-20 (1995) (citations omitted); see also Titan Holdings Syndicate, Inc. v. City of Keene, N.H., 898 F.2d 265, 269 (1st Cir. 1990) ("Just because the parties dispute the scope of a policy's coverage does not mean it is ambiguous; the meaning of the language must be unclear, and the parties' dispute based upon reasonable differences about the language's interpretation.") (applying New Hampshire law). The court therefore holds that the definition of "occurrence" at issue unambiguously requires that a causative event take place during the policy period.

ENGI next contends that the term "event" in the definition of occurrence does not mean a sudden and discrete event, but

rather an unintentional act, implying that ongoing environmental contamination or damage can be the event triggering coverage. ENGI again urges the court to follow the decision in <u>Associated Electric</u>, C-95-591-B (D.N.H. Sept. 30, 1998), which found the term "event" to be ambiguous. The <u>Associated Electric</u> court noted that neither the policy at issue nor New Hampshire law defined "event," and looked to the differing interpretations the term has received in other jurisdictions, as well as the alternative dictionary definitions for the term, in deciding that the term is ambiguous. <u>Associated Electric</u>, C-95-591-B, slip op. at 30-32 (D.N.H. Sept. 30, 1998).

ENGI cites the same cases referred to in <u>Associated Electric</u> to support its position that the term "event" can be interpreted to cover ongoing environmental contamination: <u>Cessna Aircraft Co. v. Hartford Accident & Indem. Co.</u>, 900 F. Supp. 1489 (D. Kan. 1995); <u>Outboard Marine Corp. v. Liberty Mut. Ins. Co.</u>, 670 N.E.2d 740 (Ill. App. Ct. 1996); <u>Pittsburgh Corning Corp. v. The Travelers Indem. Co.</u>, 1988 WL 5301 (E.D. Pa. Jan 21, 1988).[14]

---

[14]As ENGI does not make an argument based on alternative dictionary definitions here, the court will not address that point. In any case, the court finds that the correct meaning of

29

While the term has been so construed, those cases do not support finding an ambiguity in the term "event" that would favor coverage under the circumstances of this case.

In Cessna Aircraft Co., 900 F. Supp. at 1504, the court interpreted a policy that defined "occurrence" similarly to the policy at issue here.[15] The court found that coverage under the policy could be triggered according to the theory advanced by plaintiff, namely, "that exposure of groundwater to contamination is an 'event' within the occurrence definition of the policy." Id. Although the opinion does not explicitly make the distinction, however, the "exposure" referred to, while ongoing, appears to have been initial exposure rather than continuous damage caused by migrating or leaching chemicals. In other words, the policies at issue were effective between 1959 and 1972, id. at 1496 (specifically referring to the Smith and Companies' policies), during which time Cessna appears to have

_____

the term "event" here can be determined by the context in which it is used.

[15]The policy defined "occurrence" as "one happening or series of happenings, arising out of or due to one event taking place during the term of this policy." Cessna Aircraft Co., 900 F. Supp. at 1504.

30

been actively using the hazardous material that was allegedly disposed of improperly, see id. at 1494-95 (Cessna began using trichloroethylene at the subject Fluid Power plant in 1952 and sold the plant in 1988).  Moreover, Cessna admitted "that it had transported waste materials, including barrelled [sic] waste solvent to the municipal landfill located in the area [of the superfund site] from 1953 through 1968 when the landfill closed." Id. at 1495.  Thus, Cessna does not appear to support the contention that an "event" can take place under the definition of occurrence at issue years after the disposal of, or initial "exposure" to, hazardous wastes has ceased.

Neither Outboard Marine Corp. nor Pittsburgh Corning Corp., 1988 WL 5301, directly supports an alternate interpretation of the term "event," as neither case expressly defined or interpreted that term.  Moreover, the reasoning in these cases is unpersuasive.  The Outboard Marine and Pittsburgh Corning courts found continuous triggers of coverage under the policies at issue; in other words, the courts found that coverage was triggered whenever injury-in-fact occurred.  See Outboard Marine Corp., 670 N.E.2d at 748 (finding persuasive the reasoning that a

31

continuous trigger theory is appropriately used "where injury-in-fact occurs continuously over a period covered by different insurers or policies," and affirming trial court's finding that environmental contamination occurring between 1953 and 1976 "amounted to a single continuing occurrence" that triggered all of the policies at issue (internal quotation marks omitted)); Pittsburgh Corning Corp., 1988 WL 5301 at *8 (finding that "[t]he policy language is ambiguous as to when an injury occurs, thereby triggering coverage"). Under the occurrence-based language at issue, however, coverage is not triggered by property damage alone. Rather, as noted previously, these policies requires a causative event to take place during the policy period. Cf. Cessna Aircraft Co., 900 F. Supp. at 1504 (interpreting similar policy language to "conclude[] that the policies unambiguously require an occurrence, as opposed to property damage, during the policy period").

Furthermore, none of the cases cited by ENGI interprets the term "event" in context, that is, in relation to other terms and phrases - e.g., "happening," "series of happenings," and "arising out of or due to" - in the definition of occurrence. See High

32

Country Assoc., 139 N.H. at 41 (court "take[s] the plain and ordinary meaning of the policy's words in context".)   In contrast, courts construing the term in context have found it to plainly and unambiguously preclude coverage in situations like the instant one.   See Public Services Electric and Gas Co., supra, at 12-13 (finding that "the 'event' alluded to in the policy definition refers to the contamination itself, such as a leak or a spill, and not to any subsequent leaching or migration of contaminants," which instead "would qualify as the 'happening or series of happenings arising out of . . . [the] event.'"); Indiana Gas Co., 951 F. Supp. at 789 ("Interpreting the 'occurrence' language to provide coverage for 'any happening . . . taking place during the term of this contract would . . . ignore the plain meaning of the sentence by ignoring the restrictive 'arising out of or due to one event' language."); cf. Associated Electric, C-95-591-B, slip op. at 17 (D.N.H. July 1, 1999) (although holding that the term "event" is ambiguous, finding that the surrounding language in the definition of occurrence - i.e., "'one happening or series of happenings, arising or due to one event'" - "suggest[s] the definition's

33

focus on the occurrence of discrete incidents" and makes a broad construction of the term "to include gradual property damage . . . far less likely" than the insurer's construction of the term as a discrete incident).

Accordingly, this court departs somewhat from the decision in Associated Electric and holds that the term "event," as used in context in the definition of occurrence in the policy at issue and as applied to the circumstances of this case, is unambiguous, and does not cover ongoing damage by, or migration of, hazardous wastes years after those wastes were produced and released at the site. Thus, LMI are entitled to summary judgment on the trigger of coverage and, as that issue is dispositive, the remaining motions for summary judgment are denied as moot.

## Conclusion

For the foregoing reasons, LMI's Motion for Summary Judgment regarding Trigger of Coverage (document no. 155) is granted. The remaining motions for summary judgment (documents no. 149, 150, 151, 152, 153, 154 and 156) are denied as moot.

34

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

September 29, 2000

cc:   Bruce W. Felmly, Esq.
      Emily G. Rice, Esq.
      Paul A. Leodori, Esq.
      Doreen F. Connor, Esq.
      John A. Guarascio, Esq.
      Michael F. Aylward, Esq.
      Kimball A. Lane, Esq.